# United States Court of Appeals
## For the First Circuit

Nos. 02-1085
     02-1086
     02-1087
     02-1088

UNITED STATES,

Appellee,

v.

ANDRÉS GARCÍA-TORRES, ANGEL MANUEL GARCÍA-TORRES,
DERI VENTURA-GARCÍA, and WALTER BATÍZ-RIVERA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Ignacio Fernández de Lahongrais for appellant Andrés García-Torres.
Ramón García García for appellant Walter Batíz-Rivera.
Enrique Vélez Rodríguez for appellant Angel Manuel García-Torres.
Sonia I. Torres Pabón, Assistant United States Attorney, with whom H.S. García, United States Attorney and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief, for appellee.

August 22, 2003

**LIPEZ, Circuit Judge**. These consolidated appeals arise from an indictment alleging that the appellants, along with over seventy other co-defendants, participated in an extensive drug smuggling and distribution network in southwest Puerto Rico from 1994 to 1997. The appellants were all convicted at trial and sentenced to lengthy prison terms. They make various assignments of error with regard to the jury charge, a post-trial denial of a motion for a new trial on Brady grounds, and sentencing. With respect to the latter, we must decide whether the grouping of offenses pursuant to § 3D1.2 of the United States Sentencing Guidelines ("Guidelines") precludes consecutive sentences. Concluding that it does not, we affirm all of the convictions and sentences.[1]

## I.

We begin with a brief precis of the facts giving rise to these appeals. We provide further factual development as necessary in the sections addressing the appellants' various claims. For more extensive background information, we refer the reader to the prior appeals of other co-defendants — United States v. García-

---

[1] Three of the appellants (Andrés García-Torres, Manuel García-Torres, and Walter Batíz-Rivera) have, through counsel, filed a consolidated brief. Appellant Deri Ventura-García, through counsel, has filed his own brief in which he only challenges the district court's denial of his motion for a new trial. See infra Part III.

<u>Torres</u>, 280 F.3d 1 (1st Cir. 2002); and <u>United States</u> v. <u>Martínez-Medina</u>, 279 F.3d 105 (1st Cir. 2002).

All of the appellants in this case allegedly participated in an extensive drug importation and distribution ring headed by Angela Ayala-Martínez ("Ayala"). Through contacts in Colombia, Ayala would arrange for large quantities of drugs to be air-dropped into the ocean off the coast of Puerto Rico. She would then send several of her associates — including Manuel Pérez-Colón ("Pérez-Colón") and appellants Andrés García-Torres ("Andrés") and Deri Ventura-García ("Ventura") — to recover the drugs from the ocean. The drugs would then be stored by members of Ayala's organization and "decked" (i.e., prepared for distribution) by Ayala's confederates — including appellants Walter Batíz-Rivera ("Batíz"), Ventura, Andrés, and Andrés's brother, appellant Angel Manuel García-Torres ("Manuel"). The drugs were then distributed by these persons and others to places in Puerto Rico and elsewhere in the United States.

Locally, Ayala supplied and controlled distribution sites (called "points") which were "owned" (i.e., run) by individual dealers. Several of these points were located near housing projects in and around the city of Ponce. For example, the point at Atocha was owned by Edward Meléndez-Negrón, a.k.a. Danny Gongolon ("Gongolon"). The point at Los Lirios del Sur housing project was owned by Pérez-Colón, and the point at Tibes belonged

to Ayala herself. Of particular significance to these appeals, the La Cantera drug point belonged to Tommy García-Torres ("Tommy"), the brother of Andrés and Manuel, until August 1995 when he was murdered. The La Cantera drug point was then "inherited" by Manuel and Ventura.

Ayala's drug distribution network and the various drug points were maintained through violence or threatened violence, and a number of killings took place over several years. The network processed hundreds of kilos of cocaine and generated a sizeable amount of cash receipts. Ayala, along with her coconspirators, concealed these sums of cash by money laundering them through the purchase of goods and services, in particular air conditioners and expensive vehicles that were registered under different names.

In December 1997, a grand jury returned a superceding indictment alleging, inter alia, that from mid-1994 to mid-1997, seventy-six individually named defendants participated in a conspiracy to distribute illegal narcotics (Count I). See 21 U.S.C. §§ 841(a)(1), 846. The indictment also alleged that twenty-nine of these defendants conspired to launder money (Count II). See 18 U.S.C. § 1956(a), (h). The vast majority of the defendants pleaded guilty and were sentenced to lengthy prison terms. The four appellants herein, together with Ayala, Pérez-Colón, and Marcos Martínez-Medina ("Martínez"), were convicted following a jury trial that lasted over forty days. The jury found appellants

Andrés and Manuel guilty on Counts I and II (drug conspiracy and money laundering conspiracy), and appellants Ventura and Batíz on Count I (drug conspiracy) only. Andrés and Manuel were sentenced on each count to twenty years of imprisonment, the terms to be served consecutively, for a total of forty years of imprisonment. Ventura and Batíz were each sentenced to twenty years for their convictions on Count I.

## II.

Andrés and Manuel were convicted in Count II of violating 18 U.S.C. § 1956, which provides in pertinent part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity —
>
> > (A) (i) with the intent to promote the carrying on of specified unlawful activity; or
> >
> >       * * *
> >
> > (B) knowing that the transaction is designed in whole or in part —
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .
>
> shall be sentenced to a fine . . . or imprisonment for not more than twenty years, or both.

Id. (emphasis added). Subsection (A)(i) can be described as the "promotion" element of the statute, and subsection (B)(i) can be described as the "concealment" element of the statute. As the

-5-

statute unambiguously indicates, a conviction may be predicated on
either the promotion prong or the concealment prong.

The superceding indictment in this case alleged that
Andrés and Manuel, in conjunction with others, conspired to violate
§ 1956, with the language of the indictment closely tracking that
of the statute with one exception.  The indictment alleged that
Andrés and Manuel had conspired to conduct unlawful financial
transactions "with the intent to promote the carrying on of
specified unlawful activity and knowing that the transactions
[were] designed in whole or in part to conceal or disguise the
nature, the source, the ownership, or the control of the proceeds
of specified unlawful activity" (emphasis added).  Thus, while the
statute puts the promotion and concealment elements of § 1956 in
the disjunctive, the indictment alleged them in the conjunctive.

The district court, for its part, properly instructed the
jury in the disjunctive:

> Section 1956(a)(1) of Title 18 of the
> United States Code makes it a crime to,
> knowing that the property involved in a
> financial transaction represents the proceeds
> of some form of unlawful activity, conduct or
> attempt to conduct a financial transaction
> which in fact involves the proceeds of
> specified unlawful activity.
>
> One, with the intent to promote the
> carrying on of a specified unlawful activity;
> or
>
> Two, knowing that the transaction is
> designed in whole or in part to conceal the
> nature, the location, the source, the

-6-

ownership, or control of the proceeds of specified unlawful activity.

(emphasis added). Andrés and Manuel now argue that it was reversible error for the district court to instruct the jury in the disjunctive while the indictment alleged the violation of § 1956 in the conjunctive. Moreover, the argument goes, if the district court had properly instructed the jury in the conjunctive, the government would have had to prove both the concealment prong and the promotion prong beyond a reasonable doubt. Andrés and Manuel claim that the government did not adduce any evidence on the concealment prong, and, therefore, they are entitled to have their conviction reversed on the money laundering count.

In evaluating this claim, we first note that Andrés and Manuel failed to object to the jury instruction they now say was erroneous. Hence their argument about the jury instruction has been forfeited. See United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001) ("[I]t is settled beyond peradventure that a party's failure to object to the charge in strict conformity with the prerequisites of Rule 30 forfeits most instructional errors."). Although the appellants can still invoke plain error review, this standard is notoriously difficult to meet.

> To vault this hurdle, a defendant must make four showings. First, he must show that an error occurred. Second, he must show that the error was clear or obvious. Third, he must show that the error affected his substantial rights. Fourth, he must show that the error so seriously impaired the fairness, integrity, or

> public reputation of the proceedings as to threaten a miscarriage of justice.

Id.; see Johnson v. United States, 520 U.S. 461, 466-67 (1997); United States v. Olano, 507 U.S. 725, 732 (1993).

While we have not previously had occasion to consider the argument presented by Andrés and Manuel, the Ninth Circuit has. In United States v. Booth, 309 F.3d 566 (9th Cir. 2002), the defendant was convicted of violating 18 U.S.C. § 1956(a)(1). The indictment had "alleged conjunctively that [the defendant] conducted the unlawful financial transactions 'with the intent to promote the carrying on of the specified unlawful activity and knowing that the transaction was designed . . . to conceal and disguise' the proceeds." Booth, 309 F.3d at 571-72 (modifications in original). At the close of the trial, however, the court instructed the jury in the disjunctive: "the jury was permitted to convict if it found that [the defendant] had conducted the money laundering transactions either with the intent to promote the unlawful activity or knowing that the transactions were designed to conceal." Id. at 572.

As the Ninth Circuit succinctly put it, "[t]here was no reversible error in this sequence of events." Id. "Quite simply, the law is well established that where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive."

<u>United States</u> v. <u>Simpson</u>, 228 F.3d 1294, 1300 (11th Cir. 2000).  As

we indicated over thirty years ago in <u>United States</u> v. <u>Barbato</u>, 471

F.2d 918 (1st Cir. 1973), a prosecution for fraud under 18 U.S.C.

§ 1010:

> Where a statute . . . sets forth several
> different means by which an offense may be
> committed, it is permissible for a count in an
> indictment to allege all or several of these
> means in the conjunctive.  A conviction on
> such a count will stand if the evidence
> establishing one or more of the means of
> commission alleged is sufficient to support a
> jury verdict.

<u>United States</u> v. <u>Barbato</u>, 471 F.2d 918, 922 n.3 (1st Cir. 1973);

<u>see</u> <u>also</u> <u>United States</u> v. <u>Miller</u>, 471 U.S. 130, 134-38 (1985)

(indicating that, if indictment gave clear notice of charges, there

is no reversible error when jury convicts on proof of only one of

several means of committing crime alleged in the indictment).  As

a result, "proof of any one of those acts conjunctively charged may

support a conviction."  <u>United States</u> v. <u>LeDonne</u>, 21 F.3d 1418,

1427 (7th Cir. 1994); <u>United States</u> v. <u>Fontana</u>, 948 F.2d 796, 802

(1st Cir. 1991).  There was no error in the jury instruction on the

crime of money laundering.  Andrés and Manuel concede that the

government presented sufficient evidence to satisfy the promotion

prong of § 1956.  We therefore affirm the convictions of Andrés and

Manuel on Count II.

Following their convictions but prior to sentencing, all four appellants, together with Martínez, moved for a new trial under Brady v. Maryland, 373 U.S. 83 (1963), claiming that the government had improperly withheld a sworn statement containing exculpatory and impeachment evidence. In July 1999 the district court conducted a two-day evidentiary hearing on the motion. In a thorough opinion and order dated May 18, 2000, the district court denied the request for a new trial. The appellants now assign error to this ruling. Before addressing the appellants' claim of error, however, we must first describe in some depth the evidence presented at trial concerning the murders of Michael and Eddie Vázquez, an event that is central to the new trial motion. Many of the facts described below have already been recounted in Martínez-Medina, 279 F.3d at 112-13.

## A. Factual Background

At the La Cantera drug point, a dispute arose in 1994 when Tommy (the brother of Andrés and Manuel) fired "Gerardito," his brother-in-law and a drug runner, for having allegedly stolen over $35,000 in drug proceeds. Following his ouster, Gerardito and his brother "Nelsito" began to associate with Michael Vázquez ("Michael") and his father Eddie Vázquez ("Eddie"). While the Vázquezes had no demonstrated connection with the drug trade, they did have a sizable cache of weapons and were willing to help

Gerardito seek revenge against the García brothers. A violent feud soon developed with the Garcías and their allies (including Ventura, Ayala, Martínez, Batíz, and Gongolon) on one side, and Gerardito and his faction (including Nelsito, the Vázquezes, and the Vázquezes' employee, José Negrón-Santiago, a.k.a. "Bejumen") on the other.

Over the next few years, this rivalry turned deadly. In 1995 Tommy and a confrere were murdered in separate incidents. That same year, a friend of Gerardito, "Gordo," was also murdered. Each side blamed the other. The following year, Eddie shot and wounded Gongolon. The ongoing violence targeted the drug points of the García faction and caused the García brothers and their colleagues to fear that Gerardito's clan was bent on revenge and the takeover of their business. Moreover, the violence at the points had attracted the attention of the local police, causing sales figures to drop. So, from 1995 to 1997, the García brothers and their colleagues repeatedly attempted to find and kill Gerardito, Nelsito, the Vázquezes, and Bejumen to put an end to it all.

They eventually succeeded. On February 14, 1997, Bejumen and his wife were shot and killed in their automobile. Gamaliel Goglas-Valentin ("Goglas"), an auto shop employee who also stored drugs and guns for the Garcías, testified at trial that Andrés, Manuel, and Martínez drove into his shop and celebrated openly that

-11-

they had "finally got the bastard," Bejumen. He also testified that Andrés reported that the three of them had ambushed Bejumen's car, and that Martínez and Andrés then opened the car door and shot Bejumen and his wife repeatedly at close range.

Danny Gongolon testified at trial that a few days after Bejumen's murder, Ventura approached Gongolon and told him that Manuel knew some kidnappers who knew where the Vázquezes lived. For a $20,000 fee, these kidnappers were willing to pose as police officers and "arrest" Michael and turn him over to the García faction. The $20,000 price tag was to be split among Manuel, Gongolon, Ventura, and Ayala. At a meeting later that day, Gongolon, Andrés, Manuel, Ventura, and Batíz made plans to carry out the abduction and murder.

As we indicated in Martínez-Medina, what happened next is not altogether clear.

> Although the testimony of various witnesses is somewhat unclear as to the precise chain of events, it appears that the kidnappers handed Michael Vázquez over to associates of the García group — including Manuel and Andrés García, Gongolon, Ventura, and Batíz — who drove away with him and killed him. They also found and shot Eddie Vázquez.

279 F.3d at 112. Goglas testified that the morning after the Vázquez murders, Manuel and Ventura came to his shop to have him repair bullet damage to their vehicle. At that time, Manuel and Ventura recounted the Vázquez murders to him. A couple of weeks afterwards, he ran into Andrés who also spoke of his role in the

-12-

abduction and murders.  Gongolon testified that immediately after the Vázquez killings, he called Ayala to announce that he had some good news; he also told her to prepare breakfast and that he would be right over.  He then drove to Ayala's house and immediately told her of the Vázquezes' deaths.  Ayala expressed elation at the news, and after breakfast she drove to the scene of the murders to see for herself.

## B.  The Purported **Brady** Material

The motion for a new trial is based on a sworn statement by Jaime Morales-Rivera ("Morales") that was given to the Puerto Rico state prosecutor in May 1998 during the course of an investigation into the Vázquez murders.  The appellants first learned of the existence of Morales's statement at a preliminary hearing in the state prosecution of Manuel and Ventura for the Vázquez murders, four months after the verdict had been entered against them in the federal case.[2]

In the statement, Morales declared that he joined the Puerto Rico police in 1992.  While an officer, he participated in various criminal activities, including burglary, kidnapping, murder, and planting of evidence.  For example, Morales assisted José Galiany-Cruz ("Galiany") in an attempt to kidnap someone on

---

[2] Manuel, Andrés, and Ventura eventually pleaded guilty in state court to the murder of Michael Vázquez.

behalf of Galiany's employer, Santos Martínez ("Santos"), a drug dealer apparently unconnected to Ayala and the Garcías.

In his statement, Morales goes on to say that Galiany approached him about another job for Santos in February 1997 involving the kidnapping of someone whose father, according to Galiany, owed Santos four million dollars. That "someone" turned out to be Michael Vázquez, whose father was Eddie Vázquez. The statement then provides details of Morales's involvement in Michael's abduction and murder. While Morales's account of what happened the night of the Vázquez murders varied in some minor ways from the testimony presented at trial, the substance of his testimony did not vary significantly from the testimony of Goglas and Gongolon.

### C.  The Motion for a New Trial

Upon learning of the existence of the statement, appellants Andrés, Manuel, Ventura, Batíz, and co-defendant Martínez all moved for a new trial. They claimed that the government had intentionally withheld the statement and that it contained exculpatory and impeachment evidence of such probative value that it undermined confidence in the verdict. According to the defendants, the statement was exculpatory because it demonstrated that the Vázquez murders were not part of the conspiracy charged in this case, and because it could be used to impeach the testimony of Gongolon and Goglas regarding the

-14-

defendants' involvement in the Bejumen and Vázquez murders. In response, the government conceded that it was in possession of the sworn statement well before the start of trial and that it should have been divulged to the defendants. The government maintained, however, that the withholding of the evidence was unintentional and not in bad faith. Moreover, according to the government, the statement would have been ultimately inadmissible and/or immaterial, and, therefore, its absence did not undermine confidence in the verdict.

The district court conducted a two-day hearing which included testimony from Morales, Galiany, the local district attorney, and an FBI agent assigned to the case. Galiany testified that he had been approached by Manuel who told him that he was having problems with Michael and Eddie Vázquez, and that Manuel suggested a plan in which Galiany would kidnap them and turn them over to Manuel so that he could kill them. Galiany then contacted Morales and relayed to him the plan which they eventually executed.

At the hearing, Galiany admitted to having told Morales that he had been contracted by Santos. Galiany went on to testify, however, that he had told Morales this lie in order to protect the identity of the person who had actually hired him — Manuel. The substance of Morales's testimony at the hearing was the same as contained in his prior sworn statement, with a few additional details concerning the abduction of Michael Vázquez.

-15-

The district court, after asking for post-hearing briefing, denied the motion for a new trial in an exhaustive opinion and order that dismissed the impeachment and exculpatory value of Morales's statement, determined that the government had not withheld the evidence in bad faith, and raised serious questions about the evidence's admissibility. For purposes of its analysis, however, the court assumed that the evidence would be admissible. The court then concluded that the probative value of the evidence did not merit a new trial:

> After reviewing the rest of the evidence about defendants' involvement in the charged conspiracy, the Court finds that even in the absence of the Morales [] statement[,] defendants received a fair trial which resulted in a confidence-worthy verdict. Contrary to their contention, the Vázquezes murders was not the only evidence the government had to link defendants to the charged conspiracy. At trial, the government presented the testimony, among others, of unindicted coconspirator [Goglas], who testified about the participation of [Martínez], Manuel and [Andrés] in the murders of rival gang member Bejumen and his wife. Evidence was also presented of Manuel, [Andrés] and [Ventura's] drug dealings with Angela Ayala-Martínez. The evidence also established that [Batíz] used to work for [Ventura] and Manuel decking drugs at La Cantera drug point. All this evidence sufficiently established that defendants were part of the charged, and not a separate and distinct, conspiracy.

In a previous appeal, we upheld the denial of the motion for a new trial with respect to defendant Martínez, stating that Morales's statement did not directly undermine Goglas's testimony concerning

-16-

Martínez's involvement in Bejumen's murder — the murder that "provided the main link between Martínez and the drug conspiracy." Martínez-Medina, 279 F.3d at 126. Rather, Morales's statement went only to the Vázquez murders. "Such weak impeachment evidence," we indicated, "on an issue tangential to the conviction is not sufficient to warrant the drastic remedy of a new trial." Id. at 127.

## D. The Legal Standard

When a Brady claim is raised in a motion for a new trial, we review the denial of that motion for abuse of discretion. United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002); United States v. Josleyn, 206 F.3d 144, 151 (1st Cir. 2000).[3] Under Brady and its progeny, a new trial is warranted on a Brady claim only if the withheld evidence is "material." See id. at 151–52. That is to say, a new trial is warranted only if there is a "reasonable probability" that the evidence would have changed the ultimate outcome. United States v. Bagley, 473 U.S. 667, 682 (1985). The Supreme Court further clarified the "reasonable probability" concept when it stated: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

_____

[3] However, "[w]here it is contended that the district court applied an incorrect legal standard, that contention is reviewed de novo." Josleyn, 206 F.3d at 151. There is no such claim here.

-17-

Strickler v. Greene, 527 U.S. 263, 289-90 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Both impeachment evidence and exculpatory evidence can provide grounds for a new trial. Wrongly withheld impeachment evidence can merit a new trial when "the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction." Martínez-Medina, 279 F.3d at 126. However, "impeachment evidence that is merely cumulative or collateral is insufficient to establish prejudice under Brady." Conley v. United States, 323 F.3d 7, 30 (1st Cir. 2003). As for exculpatory evidence, such evidence must still be material, and "[t]he materiality standard is not met by 'the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial.'" United States v. Hamilton, 107 F.3d 499, 509 (7th Cir. 1997) (quoting United States v. Agurs, 427 U.S. 97, 109-10 (1976)). Instead, once again, the exculpatory material must be of such probative value that there is a "'reasonable probability' that the evidence would have changed the result." United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993).

## E. Analysis

The appellants claim that, notwithstanding our earlier rejection of Martínez's Brady claim, they are entitled to a new trial because Morales's statement would have had different

-18-

consequences for them than for Martínez. They assert that the principal prosecution witness against them was Goglas, and that his testimony concerning their involvement in the Bejumen and Vázquez murders provided "the main link between appellants and the Angela Ayala conspiracy." They claim that Morales's statement sufficiently undermines Goglas's testimony regarding both sets of murders as to make all of his testimony unreliable. As for the Vázquez murders, they insist that Morales's statement would have demonstrated that their involvement in them was only the result of a grudge and not the Ayala conspiracy. Therefore, they claim, the withheld evidence sufficiently undermines confidence in the verdict to warrant a new trial. We disagree.

As we noted in Martínez's case, the exculpatory and/or impeachment value (if any) of Morales's statement only directly pertains to the Vázquez murders. As the district court noted, if the appellants had managed to get the Morales statement admitted into evidence (a questionable proposition), the government would have then been entitled to call Galiany as a witness, and Galiany would have likely testified (as he did at the Brady hearing) that he had fabricated the story about Santos having ordered the kidnapping in order to keep Morales from learning that the García group was behind the plan. Moreover, any impeachment value of the statement, as the district court noted, would have been minimal since the deviations in substance concerning the mechanics of the Vázquez murders were negligible.

-19-

Additionally, as the district court noted in its opinion, the Vázquez and Bejumen murders were hardly the only evidence linking Andrés, Manuel, and Ventura with the Ayala drug distribution network. There was testimony from other witnesses that cash and drugs repeatedly exchanged hands among these three appellants and Ayala, and that Andrés and Ventura helped Ayala retrieve airdropped drugs from the sea. Witnesses also testified about the control Ventura and Manuel exercised over the La Cantera drug point, as well as the intimate role that Batíz played in La Cantera's administration.

Finally, the appellants exploited other opportunities to attack Goglas's credibility, such as his inconsistencies and omissions between his trial and grand jury testimony. Therefore, in light of the weak evidentiary value of Morales's statement, and the substantial other evidence of the appellants' involvement in the conspiracy, we cannot say that the government's failure to produce the Morales statement "undermine[s] [our] confidence in the verdict." Martínez-Medina, 279 F.3d at 126 (quoting Kyles, 514 U.S. at 435). The district court properly denied the appellants' motions for a new trial.

**IV.**

The appellants make three arguments related to their sentencing. Manuel and Andrés claim that the sentencing court erred in failing to group the drug conspiracy and the money

-20-

laundering convictions under section 3D1.2 of the Guidelines. They also claim that the court erred in sentencing them to the statutory maximum on the money laundering count. Finally, Manuel and Batíz claim that the court erred when it sentenced them without the benefit of an updated Pre-Sentence Report.

## A. Grouping

Section 3D1.2 of the Guidelines provides that closely related counts should be "grouped" for purposes of sentencing. Manuel and Andrés's respective Pre-Sentence Reports ("PSR") contained identical paragraphs regarding the grouping of their convictions on Count I (drug conspiracy) and Count II (money laundering conspiracy):

> Offense conduct comprising drug trafficking and money laundering are normally grouped together into a combined group as the offense conduct involves substantially the same harm within the meaning of Guideline § 3D1.2(b); to wit: the counts involve the same victim (society) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. However, the offense conduct comprising count one not only involved generalized drug trafficking activities, but also involved murder. As such, the two counts are not groupable under the provisions of Guideline § 3D1.2 and are treated as to [sic] distinct counts to be grouped under the provisions of Guideline § 3D1.4, Determining the Combined Offense Level.

The defendants objected to this reasoning, arguing that Counts I and II should have been grouped according to the plain language of

U.S.S.G. § 3D1.2(c) and (d),[4] and they renew this argument on appeal. The government, citing no authority, responds by simply stating that since the drug conspiracy involved murder, Count I was somehow "exempt" from grouping under any provision of the Guidelines.

These arguments reflect a shared failure by appellants and the government to understand that the district court did, in fact, group the two counts for sentencing purposes. The misunderstanding apparently arises because of the court's imposition of consecutive sentences, which the appellants and the

_____

[4] Section 3D1.2 of the Guidelines provides, in pertinent part:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
> * * *
> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
>
> [The following offenses] are to be grouped under this subsection:

Subsection (d) then goes on to identify the offenses which it covers. Drug conspiracy and money laundering are included in that list.

government interpret as a rejection of "grouping." There was no such rejection by the district court.

Early in Manuel's sentencing hearing, the court indicated its inclination to adopt the factual findings of the PSR with respect to Count I. Relying on the guideline for a drug conspiracy, U.S.S.G. § 2D1.1(c)(3), the court calculated a base offense level of 38 since the offense of conviction involved more than 150 kilograms of cocaine. Then the court indicated that it was inclined to add a four-level enhancement pursuant to § 3B1.1(a) because of Manuel's leadership role; a two-level enhancement pursuant to § 2D1.1(b)(1) because of his possession of dangerous weapons during the offense; and a two-level enhancement pursuant to § 3C1.1 because of his attempts to obstruct justice in connection with police investigations into the Bejumen and Vázquez murders, resulting in an adjusted offense level ("AOL") of 46. Given that the maximum possible offense level under the Guidelines is 43, the court stated that it was inclined to use that number. According to the Sentencing Table in Part 5 of the Guidelines, an AOL of 43 results in a guideline sentencing range ("GSR") of life in prison, irrespective of criminal history.[5] The court said nothing about an offense level for Count II. The court did state, however, that it was inclined to exercise its "discretion" under § 5G1.2(d) and

_____

[5] The court did state that it was inclined to set the criminal history category of Manuel at III.

impose the statutory maximum sentence (20 years) on each count, the terms to run consecutively.[6]  The court then heard from counsel.

Manuel raised many objections to the court's sentencing rationale, all of which were overruled.  In particular, he argued — in an apparent reference to the imposition of consecutive sentences — that the court had to "group" the two counts for sentencing and hence could not impose consecutive sentences.  The sentencing court responded with an explanation that reflected a clear understanding of the rules of grouping, as that term of art is used in § 3D1.2:

> Regarding consecutive sentences, <u>the guidelines provide and it is mandatory that we group counts 1 and 2 for sentencing purposes we have no discretion in that sense.  We are mandated by the guidelines to group them together.</u>  To determine the maximum guideline range of the 2 counts and than [sic] apply that guideline range.  <u>In this case what the court proposes to do, and according to the findings that I just stated, we group counts 1 and 2 as mandated by the guidelines.</u>  We determine the guideline range for count one which gives a guideline range of life.  That is the highest guideline range for both counts.  Count one, the maximum statutory is 20 years, . . . the court will not impose over 20 years regarding count 1.  Regarding count two, the guideline range is life imprisonment, it is the same guideline sentencing range.[7]

---

[6] Section 5G1.2 of the Guidelines is captioned "Sentencing on Multiple Counts of Conviction" and is discussed in more detail, <u>infra</u>.

[7] The applicable guideline for the money laundering count provides that the offense level for that count is "[t]he offense level for the underlying offense from which the laundered funds

-24-

However the statutory maximum is 20 years. So we will apply the statutory maximum. That is how this court has arrived at those sentencing maximums. Regarding the consecutive part, we believe this court is authorized under section 5G1 of the guidelines to provide that these sentences be consecutive in order to provide that the total punishment of these guidelines be complied as much as possible within the statutory maximums.

(emphasis added). Under the relevant "grouping" section of the Guidelines, § 3D1.3(a), "the offense level applicable to a Group is the offense level . . . for the most serious of the counts comprising the Group." The district court's decision to focus on Count I, and only calculate an AOL and GSR for that count, is therefore consistent with the rules regarding grouping.[8] Hence, contrary to Manuel's position on appeal, the district court did not fail to "group" Counts I and II for sentencing.[9] As far as we can

---

were derived," U.S.S.G. § 2S1.1(a)(1), that is to say, the same offense level as the drug conspiracy.

[8] Even if the sentencing court had not grouped the two counts, the combined offense level would have been the same as the offense level arrived at by the district court. The base offense level for money laundering is the same as that for the underlying criminal activity. See U.S.S.G. § 2S1.1(a)(1). As a result, the combined offense level for the two ungrouped counts would have been the same as the offense level applicable to both crimes. See id. § 3D1.4(a). Thus, even a decision not to group would have had no net effect.

[9] We realize that at the end of the hearing, when the court was orally imposing Manuel's sentence, the court appears to have read some of the text of the PSR when, according to the transcript, the court stated:

Offense conduct comprising drug trafficking and money laundering are normally grouped together into a combined

-25-

tell, Manuel's grievance is with the court's decision to impose consecutive rather than concurrent sentences, apparently on the theory that grouping precludes consecutive sentences.

Section 5G1.2(d) of the Guidelines provides that:

If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

The "total punishment," as described in this section, "is the sentence arrived at for all counts through application of the Guidelines, including determination of the base offense levels, application of grouping provisions, and calculation of other adjustments." United States v. Lott, 310 F.3d 1231, 1242 (10th

---

group as the offense conduct involves substantially the same arm [sic] within the meaning of guideline section 3D1.2(b) to wit the counts involve the same victim, society and 2 or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. However, as the offense conduct comprising count 1 not only involved generalized drug trafficking activities but also involved murder, the 2 counts of conviction are not groupable under the provisions of section 3D1.2.

Immediately after making these comments, however, the court calculated Manuel's sentence by looking only to the most serious offense, i.e., Count I, a method of calculation appropriate only if the court was, in fact, grouping the two counts. Compare U.S.S.G. § 3D1.3 (explaining how to determine offense level for grouped counts) with id. § 3D1.4 (explaining how to determine combined offense level for ungrouped counts).

-26-

Cir. 2002). The sentencing court fixes this "total punishment" somewhere within the applicable GSR. See U.S.S.G. § 5G1.2, comment. (n.1) ("The combined length of the sentences ('total punishment') is determined by the court after determining the adjusted combined offense level and the Criminal History Category."). Since Manuel's GSR was not truly a range, but rather "life" only, the sentencing court had no option but to fix Manuel's "total punishment" at life imprisonment. However, the two counts on which Manuel's conviction rested each had a statutory maximum sentence of only twenty years. The sentencing court indicated that it would therefore exercise its "discretion" under U.S.S.G. § 5G1.2(d) and impose sentences on the two counts consecutively in order to get as close to a life term as possible.

Like every other circuit that has considered the issue, we have previously stated that the language of § 5G1.2(d) — indicating that sentences "<u>shall</u> run consecutively" (emphasis added) — is mandatory in order to achieve, to the greatest extent possible, a combined sentence "equal to the total punishment." <u>United States</u> v. <u>Saccoccia</u>, 58 F.3d 754, 787 (1st Cir. 1995); <u>see</u> <u>United States</u> v. <u>Lafayette</u>, No. 01-3067, 2003 WL 21766619, at *6 n.12 (D.C. Cir. Aug. 1, 2003) (collecting cases).[10] That is, if the

---

[10] In <u>Saccoccia</u>, we explained the application of this mandatory requirement in these terms:

When, as in this instance, the maximum sentence for each offense of conviction is lower than the minimum

-27-

combined statutory maximum sentences on the counts of conviction are less than the "total punishment" set by the judge within the GSR, then the court must impose maximum consecutive sentences on each count in an attempt to get as close as possible to this "total punishment."  See U.S.S.G. § 5G1.2(d).

The grouping of Manuel's two counts pursuant to § 3D1.2 does not preclude the imposition of consecutive sentences on each of them.  See United States v. Chase, 296 F.3d 247, 251 (4th Cir. 2002).  As explained persuasively in Chase, "grouping and stacking are separate concepts relevant in different stages of the sentencing process."  Chase, 296 F.3d. at 251.  Grouping is one of the first steps undertaken during the sentencing process, and is done "[i]n order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct," U.S.S.G. ch. 3, pt. D, intro. comment.  In fact, the grouping of counts will often result in an appreciably lower offense level and correspondingly lower GSR than if the

punishment mandated by the applicable GSR, the guidelines require imposition of consecutive sentences "to the extent necessary to produce a combined sentence equal to the total punishment."

Saccoccia, 58 F.3d at 786 (quoting U.S.S.G. § 5G1.2(d)); see also id. at 787 ("[T]he court below possessed the power — indeed, the responsibility — to impose a series of consecutive sentences effectuating the clearly expressed command of U.S.S.G. § 5G1.2."). In United States v. Quinones, 26 F.3d 213 (1st Cir. 1994), we indicated that a sentencing court may disregard the mandate of § 5G1.2 only "if, and to the extent that, circumstances exist that warrant a departure."  Id. at 216.

counts had not been grouped.  See, e.g., United States v. Sedoma, 332 F.3d 20, 23-24 (1st Cir. 2003).

After the sentencing court has determined the offense level (including all upward and downward adjustments) — whether for a group of counts, a combination of individual counts, or multiple groups — then, as explained above, the court fixes the "total punishment" within the applicable GSR.  While grouping plays a critical role in these early stages of the sentencing calculus, once the court has fixed the "total punishment" somewhere within the GSR, the Guidelines provide no further role for grouping in the sentencing process.  If one of the underlying counts of conviction has a statutory maximum sentence greater than or equal to the "total punishment," the court will then impose the "total punishment" on that count, with sentences on any other counts running concurrently.  See U.S.S.G. § 5G1.2(d).  If, however, none of the underlying counts of conviction have a statutory maximum sentence greater than or equal to the "total punishment," the Guidelines mandate the imposition of consecutive sentences in order to achieve (as close as possible) the "total punishment."  See id. Hence, "as a purely logical matter, there is no obstacle to stacking a defendant's sentences for grouped offenses." Chase, 296 F.3d at 251.

Other courts have repeatedly held that grouped counts may be "stacked" at sentencing.  See id.; see also Lott, 310 F.3d at

1242 (indicating that sentencing court must apply § 5G1.2(d) on grouped counts); United States v. Miller, 295 F.3d 824, 828 (8th Cir. 2002) (affirming consecutive sentences on grouped counts); United States v. Gordon, 291 F.3d 181, 195 (2d Cir. 2002) (indicating that grouped counts may be stacked); United States v. McWaine, 290 F.3d 269, 274 n.4 (5th Cir. 2002) (affirming consecutive sentences on grouped counts); United States v. Buckland, 289 F.3d 558, 572 (9th Cir. 2002) (en banc) (same); United States v. Griffith, 85 F.3d 284, 289 n.2 (7th Cir. 1996) (indicating same in dicta); United States v. Perez, 956 F.2d 1098, 1102-03 (11th Cir. 1992) (affirming consecutive sentences on grouped counts). Indeed, we have already indicated in dicta that the grouping of counts poses no bar to the imposition of consecutive sentences when necessary to achieve a combined sentence equivalent to the total punishment. See United States v. Hernandez-Coplin, 24 F.3d 312, 320 n.9 (1st Cir. 1994).

Finally, we agree with the Chase court that the stacking of grouped offenses furthers the policies underlying the Guidelines. The Guidelines were intended, in part, to create "a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. ch. 1, pt. A(3). However, "[i]f stacking for grouped offenses were prohibited, then two defendants guilty of multiple crimes might receive roughly the same sentence even though one was subject to a higher guideline

-30-

range as a result of more harmful conduct or a more egregious criminal history." Chase, 296 F.3d at 253.

In sum, the plain language of the Guidelines contemplates that consecutive sentences may be imposed on grouped counts; it has been the practice of other courts to do so; and such a practice furthers the policies underlying the Guidelines. We therefore conclude that the grouping of Counts I and II did not preclude the imposition of consecutive sentences on the grouped offenses, and we affirm Manuel's sentence.

As for Andrés's sentencing hearing (which occurred immediately after Manuel's), the court followed the same approach. It alluded to the PSR's claim that the two counts should not be grouped, but, ultimately, the court did group them when it calculated the GSR by looking only to Count I. The court determined that the base offense level for Count I, as in Manuel's case, was 38. The court then made a two-level adjustment for weapons possession, and arrived at an AOL of 40. Cross-referencing to a CHC of III, the court arrived at a GSR of 360 months to life. The court determined that within that range, a total punishment of life was appropriate "due to all the facts of this case[,] the defendant[']s participation, his disregard for life, for murders and all of the other incidents that this court saw throughout the three months of trial." Having thus fixed the total punishment at life, the district court was obligated under § 5G1.2(d), as it was

in Manuel's case, to impose a 20-year sentence (the statutory maximum) on each count, the sentences to run consecutively. We discern no error in the sentencing of Andrés.

### B. The Money Laundering Count

Manuel and Andrés argue that the sentencing court erred when it sentenced them to the maximum term on the money laundering count "without making any particularized findings of fact" regarding the value of the funds laundered. As explained in the preceding section, however, the district court made no findings whatsoever on the money laundering count because the court grouped the two counts and calculated Manuel and Andrés's GSRs only according to its findings on the "most serious" count, i.e., the drug count. Once the court determined the total punishment for Manuel and Andrés, it was then obligated to sentence them to the statutory maximum on each count, and impose those sentences consecutively, in order to achieve a final sentence that most closely approximated that total punishment. Thus, if the district court had made particularized findings on the money laundering count, they would have had no effect on the ultimate sentence imposed. We therefore reject this assignment of error.

## C.  The "Post-Sentence" Report

Appellants Manuel[11] and Batíz argue that the trial court erred when it sentenced them without the benefit of an updated PSR. Initial PSRs for Manuel and Batíz were prepared by the Probation Office on April 20, 1999.  Because of various post-trial motions, including some based on Apprendi v. New Jersey, 530 U.S. 466 (2000), their sentencing was postponed until December 2001.  Manuel and Batíz also lodged several objections to the PSR's calculations. At their sentencing, they objected to a murder cross-reference on Count I, and, in the case of Manuel, certain findings regarding Count II.  As indicated in Part IV.A, supra, however, the court ultimately did not apply a murder cross-reference on Count I, and with regard to Manuel's sentencing, the court made no findings on Count II since the court grouped that count with Count I.  A month after the court had imposed its sentence, the probation office issued updated PSRs that no longer reflected the murder cross-reference.  Manuel and Batíz claim that, as a result of the issuance of this "Post-Sentence Report" (as they call it), they are entitled to be resentenced.

---

[11] The consolidated brief indicates that this argument is being advanced by Manuel and Batíz.  The Supplemental Appendix, however, only contains copies of revised PSRs for Andrés and Batíz. Regardless of who is actually pressing this claim, we find it to be meritless.

The version of Rule 32 of the Federal Rules of Criminal Procedure in effect at the time of sentencing provided in pertinent part:

> The probation officer must make a presentence investigation and submit a report to the court before the sentence is imposed, unless:
>
> (A)  the court finds that the information in the record enables it to exercise its sentencing authority meaningfully under 18 U.S.C. § 3553; and
> (B)  the court explains this finding on the record.

Fed. R. Crim. P. 32(b)(1) (2001).  Section 6A1.1 of the Guidelines contains almost identical language.

Our examination of the sentencing transcript reveals that the sentencing court complied with these requirements.  At the sentencing hearing the court indicated that it was setting the offense levels on Count I based on its recollections of the evidence presented at trial, and on the factual findings contained in the original PSRs.  The court was aware of the defendants' objections to those factual findings, and the court overruled them.  As explained above, the court ignored the PSRs' cross-referencing of murder.  The fact that a subsequent PSR, completed post-sentencing, reflected the court's decision, is simply irrelevant.  The court had sufficient information before it "to exercise its sentencing authority meaningfully," and we therefore affirm the sentences imposed.

**V.**

For the foregoing reasons, we **AFFIRM** the convictions and sentences of all four appellants.

**SO ORDERED**.