# United States Court of Appeals

## For the First Circuit

---

No. 02-1570

RAFAEL MORENO-MORALES,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

---

Before

Torruella, Circuit Judge,

Coffin, Senior Circuit Judge,

and Selya, Circuit Judge.

---

Irma R. Valldejuli, for appellant.
Marie K. McElderry, Attorney, Department of Justice, Civil Rights Division, Appellate Section, with whom Ralph F. Boyd, Jr., Assistant Attorney General, and Jessica Dunsay Silver, Attorney, were on brief, for appellee.

---

July 3, 2003

---

**TORRUELLA, Circuit Judge.** Rafael Moreno Morales petitions to vacate his sentence or set aside his judgment of conviction pursuant to 28 U.S.C. § 2255 (2003) because of newly discovered evidence and Brady violations. The district court adopted the magistrate judge's report and recommendation and dismissed the petition without an evidentiary hearing. After careful review, we affirm.

## I. Facts

### A. Cerro Maravilla

We recount only the basic facts of the infamous events at Cerro Maravilla. A more detailed account can be found in the majority and minority opinions of United States v. Moreno Morales, 815 F.2d 725 (1st Cir.), cert. denied, 484 U.S. 966 (1987).

> On July 25, 1978, Arnaldo Darío Rosado and Carlos Soto Arriví were shot and killed by police on a mountain site in Puerto Rico known as Cerro Maravilla. The two men, both of whom were members of the Puerto Rico independence movement (*independentistas*), had gone to Cerro Maravilla apparently intending to blow up or otherwise sabotage a television tower located on the mountain. The police reported after the event that Rosado and Soto Arriví met their death in a shootout while resisting arrest.

Id. at 729.

The Cerro Maravilla incident became a principal issue in Puerto Rico politics as conflicting versions of the events emerged, culminating in a six-month live-televised hearing in front of the Puerto Rico Senate ("Senate") in late 1983. See id. at 754-55

(Torruella, J., concurring in part and dissenting in part). The hearings ended dramatically when four key witnesses, including police officers Miguel Cartagena Flores ("Cartagena") and José Montañez Ortiz ("Montañez"), were granted immunity and testified that Soto Arriví and Rosado had surrendered and were disarmed when they were killed by police officers in a second volley of gunfire. Id. at 755.

As a "direct result of the evidence adduced" in the Senate hearings, the federal authorities reopened a criminal investigation[1] into the events at Cerro Maravilla. Id.

## B. The Trial: Testimony of Cartagena and Montañez

Moreno Morales was a police officer present when Soto Arriví and Rosado were killed. Most officers asserted that the *independentistas* were killed in self-defense during a shoot-out, but the Senate hearings yielded a story of execution and cover-up. When questioned by local prosecutors, a federal grand jury, and attorneys conducting depositions in a civil case, Moreno Morales claimed that there was only one volley of shots and that he was not present when the *independentistas* were killed. He and nine other officers were charged with perjury and obstruction of justice and tried in federal court in February and March, 1985. Key government evidence at trial included the testimony of Cartagena and Montañez.

---

[1] There were previous inquiries by local and national law enforcement authorities. All absolved the police officers of culpability in the deaths.

Cartagena testified that when he was about to leave the area where both *independentistas* were under arrest (and alive); he heard shots, looked back, and saw Moreno Morales and Luis Reverón Martínez each holding a weapon and observed each officer's hand recoiling.

Officer Montañez testified that although he was not present, Moreno Morales told him that Soto Arriví asked Moreno Morales to "finish him up," and Moreno Morales took another officer's weapon and shot the victim. Montañez also stated that Antonio Méndez Rivera was with him at the time of the killings. This contradicted Méndez Rivera's testimony in which he stated that he saw Moreno Morales kill Soto Arriví.

The jury found Moreno Morales guilty of one count of conspiring to obstruct justice, give false testimony and suborn perjury, in violation of 18 U.S.C. § 371, and five substantive counts of perjury, in violation of 18 U.S.C. §§ 1621 & 1623.[2] Moreno Morales was sentenced to thirty years in prison. A divided panel of this Court affirmed his conviction. Moreno Morales, 815 F.2d at 752.

---

[2] Moreno Morales was later found guilty in state court of the second degree murder of Soto Arriví, and was sentenced to twenty-two to thirty years in prison, to be served after his federal sentence. Puerto Rico v. Pérez Casillas, 92 J.T.S. 171 (1992).

## C. Post-Trial

In 1992, Moreno Morales sought post-judgment relief under 28 U.S.C. § 2255. The district court denied relief and we affirmed. Moreno Morales v. United States, No. 92-1157, 1992 WL 245718, at *1 (1st Cir. Oct. 1, 1992).

Moreno Morales was denied parole in July, 1995. He filed a petition for writ of habeas corpus, arguing that the Parole Commission's denial was arbitrary and capricious. The district court denied relief and, in an unpublished decision, we upheld the ruling. Moreno Morales v. United States Parole Comm'n, No. 96-2358, 1998 WL 124718, at *4 (1st Cir. Jan. 20, 1998) (per curiam). We noted that at his parole hearing, Moreno Morales "admitted shooting Soto Arriví, saying he did so when he 'lost control' after Soto Arriví shot at him." Id. at *2.

In December, 1996, the Puerto Rico Senate held another investigation, this time to probe allegedly wrongful conduct during the Senate's original investigation of the incident. During the 1996 hearing, Cartagena testified that he did not in fact know who killed the victims at Cerro Maravilla. He testified that he was pressured into changing his testimony by prosecutors. Moreno Morales also testified, admitting that he shot at Soto Arriví, accepting responsibility for the victim's death, and asking for forgiveness from the relatives of the victims.

-5-

## D.  Evidence Presented for Review

Moreno Morales presents three categories of evidence to support the instant petition.  First, he cites the recent testimony of Cartagena before the Senate, in which Cartagena admitted that he lied during trial and claims that he in fact does not know who killed the victims at Cerro Maravilla.  Cartagena has also recently stated that before the criminal trial he took fifteen or sixteen polygraph tests administered by the government, in which he stated that he did not know who killed Soto Arriví or Rosado.  He claims that government officials told him he was failing the tests and suggested that he would be prosecuted if he did not change his story.  In response to this pressure, Cartagena stated that he changed his story to say that he saw Moreno Morales shoot one of the victims, and the government then told him that he had "passed" the polygraph examination.  Moreno Morales claims that the government only disclosed three polygraph examinations of Cartagena to the defense, and alleges that the prosecutors committed misconduct by pressuring Cartagena.

Second, Moreno Morales has recently discovered that Cartagena gave three sworn statements during the Senate Investigation in late 1983 stating that he did not know who killed the victims at Cerro Maravilla.  These documents were never disclosed to the defense.

-6-

Finally, recent Senate notes that have been released reveal that witnesses Cartagena and Montañez told the Senate during the 1983 investigation that they did not know who killed the *independentistas*. The notes show that United States Attorney Daniel López Romo and Assistant United States Attorney Celestino Matta were present during the questioning of Montañez and that Cartagena visited López Romo after he was questioned. None of these statements were disclosed to the defense during Moreno Morales's trial.

## E. Current Petition

In August, 1998, Moreno Morales sought leave to file a second or successive petition under § 2255, alleging that newly-discovered evidence of witness recantation and prosecutorial misconduct warranted relief. Finding the circumstances "sufficiently unusual so as to 'warrant a fuller exploration by the district court,'" we granted the application. Order of Court, No. 98-8025, Nov. 9, 1998 (citing Rodríguez v. Superintendent, Bay State Corr. Ctr., 139 F.3d 270, 272-73 (1st Cir. 1998)). The district court then dismissed Moreno Morales's § 2255 petition without an evidentiary hearing and subsequently issued a certificate of appealability. This appeal followed.

## II. Standard of Review

We review the district court's dismissal of petitioner's § 2255 motion de novo. Ellis v. United States, 313 F.3d 636, 641

-7-

(1st Cir. 2002). Because the district court dismissed petitioner's claim without an evidentiary hearing, we accept as true petitioner's sworn factual allegations "unless those allegations are merely conclusory, contradicted by the record, or inherently incredible." Id.

### III. Discussion

Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted. United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993). An evidentiary hearing "is not necessary when a [§] 2255 petition (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case." United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978) (quotation omitted).

### A. Brady Claim

A defendant's right to due process is violated when the prosecution suppresses evidence that is both favorable to the accused and material either to guilt or innocence. Brady v. Maryland, 373 U.S. 83, 87 (1963). Impeachment evidence may make the difference between conviction and acquittal and, thus, must be disclosed. Giglio v. United States, 405 U.S. 150, 154 (1972). The accused does not have a duty to request favorable evidence from the prosecution. United States v. Agurs, 427 U.S. 97, 107 (1976).

-8-

A petitioner must demonstrate that suppressed evidence is "material," that is, that "its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678 (1985); Barrett v. United States, 965 F.2d 1184, 1189 (1st Cir. 1992). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). "Materiality" is assessed collectively, not item by item. Id. at 436.

We assess Moreno Morales's Brady claim to discern whether he has shown the three components of a Brady violation: "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

## 1. Statements to the Senate

Moreno Morales asserts that notes and sworn statements from the 1983 Senate investigation indicating that Montañez and Cartagena did not know who killed the victims at Cerro Maravilla should have been disclosed.

There is no evidence that federal prosecutors had access to any of Cartagena's sworn statements or were aware of Cartagena's

-9-

testimony when he denied having knowledge of who fired the fatal shots at Cerro Maravilla. Moreno Morales claims that because the Senate notes indicate that Cartagena was going to meet with a federal prosecutor after he was questioned and because other portions of the notes reveal a close collaboration between the Senate investigators and federal prosecutors, we should assume that either Cartagena discussed his Senate testimony and statements with the federal prosecutor, or the federal prosecutor obtained information regarding the witness's statements directly from the Senate. From the evidence presented, we cannot make the leaps necessary to support either conclusory assumption. Moreno Morales has no evidence suggesting that the prosecutors did in fact meet with Cartagena or that Cartagena revealed his testimony to them.

The government's duty to disclose extends beyond material in the prosecution's possession. A prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. However, the Puerto Rico Senate was not acting on behalf of the federal government; rather, it was conducting independent investigations. While federal prosecutors may have observed some of the questioning and may have reopened their investigation as a result of what they learned in the hearings, the notes of the Senate hearings were under seal and there is no evidence that they were turned over to federal prosecutors. "[T]he

government has no duty to produce evidence outside of its control." United States v. Hughes, 211 F.3d 676, 688 (1st Cir. 2000). The federal prosecutors did not have access to the Senate's papers and notes. Principles of federalism lead us to the same conclusion our sister circuit has reached -- "the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of establishing a Brady violation." United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999) (holding that federal prosecutors had no duty to discover and disclose evidence obtained in an unrelated state investigation). Therefore, there was no duty to disclose Cartagena's statements.

The testimony of Montañez is different. Assuming petitioner's allegations are true, federal prosecutors were present when Montañez swore before the Senate that he did not know who killed Soto Arriví or Rosado. This contradicted his testimony at trial, and therefore was impeaching evidence that should have been disclosed under Brady. See Giglio, 405 U.S. at 154-55 (finding duty on part of prosecutor's office to reveal impeaching oral evidence). At oral argument, the government asserted that it turned over all its notes to the defense, notes which would have included the prosecutor's notes from the hearing at which Montañez testified. However, the record is devoid of any such disclosure to the defense, and we cannot assume that those notes included the impeachment evidence. We therefore accept Moreno Morales's

-11-

contention that he was not aware of Montañez's contradictory testimony before the Senate.

### 2. Polygraph Examinations

Cartagena recently stated that he was given fifteen or sixteen polygraph examinations by the federal government before the 1985 criminal trial. During every examination, save the final one, Cartagena denied being present when Rosado and Soto Arriví were killed or having any knowledge of who was responsible for their deaths. Cartagena recently stated that prosecutors threatened that if he did not testify "truthfully," his immunity from federal prosecution would be withdrawn and his family might be in danger. He states that when he changed his story and admitted being present at the scene and inculpated two officers, he suddenly "passed" the polygraph examination.

There were several motions regarding polygraph examinations during the proceedings up to and including trial; the end result was that the government was ordered to provide to the defense results of all polygraph examinations. The government disclosed three examinations given to Cartagena -- in two he denied seeing the killings and in the third he inculpated Moreno Morales.

We dismiss the government's invitation to simply accept its word that because only three polygraph examinations were disclosed, no more than three could have been administered. Nor is it inherently incredible that the government could have suppressed

-12-

several polygraph examinations in this high-profile case; whether by accidental neglect or malevolent cover-up, such Brady violations do occur in criminal cases. Moreno Morales has presented evidence contradicting the government's statements, and we assume his allegations are true for purposes of this case, although there is no evidence that the government intentionally withheld the evidence. Accepting these allegations as true, see Ellis, 313 F.3d at 641, the government withheld as many as thirteen polygraph examinations that could have been used to impeach Cartagena at trial. Assuming that it existed, that evidence should have been disclosed to the defense.

### 3. **Brady Analysis**

Even if we assume petitioner's assertions that the testimony of Montañez and the results of many polygraph examinations given to Cartagena were withheld from the defense, we find that the absence of this evidence does not undermine confidence in the outcome of the trial and is therefore not material under Brady. See Bagley, 473 U.S. at 678. At the time of trial, the defense had numerous other examples of contradictory statements made by both witnesses, including statements made under oath. Montañez was questioned about the inconsistencies in his testimonies, while the defense chose not to cross-examine Cartagena. The evidence uncovered after the trial would have been merely cumulative, and "the unavailability of cumulative evidence

-13-

does not deprive the defendant of due process." United States v. Sánchez, 917 F.3d 607, 618 (1st Cir. 1990); see also Zeigler v. Callahan, 659 F.2d 254, 266 (1st Cir. 1981) (noting that cumulative evidence is not usually material if defense had opportunity to impeach the witness by other means).

We acknowledge the impeaching power of a witness's evolving story. See Kyles, 514 U.S. at 444 ("[T]he evolution over time of a given eyewitness's description can be fatal to its reliability."). Here, however, the evolution of Cartagena's testimony was revealed to the defense in Cartagena's conflicting statements to grand juries. At the first grand jury proceeding in 1980 he denied seeing or hearing anything. At the second proceeding in 1983 he admitted hearing the second volley of shots. He later returned to reveal to the grand jury that he also saw Moreno Morales's hand recoil immediately after the second volley of shots were fired. This largely mirrors the evolution of his story in the polygraph examinations that were disclosed. The defense thus had ample evidence of a witness's story changing over time, but chose not to utilize it.

## B. Prosecutorial Misconduct

Moreno Morales claims that the prosecutors committed misconduct in shaping Cartagena's testimony by threatening prosecution or harm to his family.

-14-

Section 2255 provides for post-conviction relief only when the petitioner has demonstrated that his sentence "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). This final category includes "only assignments of error that reveal fundamental defects which, if uncorrected, will result in a complete miscarriage of justice, or irregularities that are inconsistent with the rudimentary demands of fair procedure." Id. (quotation omitted). Prosecutorial misconduct is only a ground for § 2255 relief if it violates petitioner's due process rights, see Hill v. Brigano, 199 F.3d 833, 847 (6th Cir. 1999), that is, if the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

It is true that due process is offended when a prosecutor knowingly suborns perjury to obtain a conviction. Mooney v. Holohan, 294 U.S. 103, 112 (1935). However, Moreno Morales has not demonstrated that the government knowingly used perjured testimony to convict him. Cartagena revealed more details each time he was interviewed; he stated that he was not originally forthcoming because his brother-in-law was one of the officers implicated by

-15-

his testimony.  The government could have believed that his trial testimony was truthful and complete.

At any rate, we find that, regardless of any misconduct in this case, Moreno Morales's due process rights were not offended by his conviction.  There was ample evidence besides Cartagena's testimony to support Moreno Morales's conviction, including two other witnesses who stated that Moreno Morales shot Soto Arriví. Coupled with Moreno Morales's confession, we find that any misconduct by the prosecutors did not deprive Moreno Morales of a fair trial.  See United States v. González-González, 258 F.3d 16, 25 (1st Cir. 2001).

## C.  Newly Discovered Evidence

Cartagena's statements to the Senate denying knowledge of who killed Soto Arriví and Rosado, while not Brady evidence, do constitute newly discovered evidence.  In addition, Cartagena recently recanted part of his trial testimony: during the 1996 Senate hearings, he stated that he did not see who shot the *independentistas*.  Moreno Morales seeks a new trial based on this evidence.  We note that this was the same hearing at which Moreno Morales admitted to shooting Soto Arriví.

We need not decide whether newly discovered evidence is a cognizable ground for obtaining a new trial in proceedings under § 2255.  See Barrett, 965 F.2d at 1194; see also Cruz-Sánchez v. Rivera-Cordero, 835 F.2d 947, 948 (1st Cir. 1987) (comparing

-16-

cases).  We have stated that "[a]t a minimum, petitioner would be required to meet the conventional criteria for obtaining a new trial on the ground of newly discovered evidence."  Barrett, 965 F.2d at 1194.  That would require petitioner to prove four elements: "(1) the newly discovered evidence was unknown or unavailable at the time of trial; (2) the defendant was duly diligent in trying to discover it; (3) the evidence was material; and (4) the evidence was such that it would probably result in an acquittal upon retrial."  Awon v. United States, 308 F.3d 133, 140 (1st Cir. 2002).

Regardless of whether he can show the first three elements, Moreno Morales has failed to show that the new evidence would result in his acquittal.  The new evidence revealing Cartagena's account of the events at Cerro Maravilla largely matches an account given soon after the incident (an account that was disclosed to the defense).  Moreover, the new evidence Moreno Morales seeks to introduce emerged at the same time as additional new evidence -- the fact that Moreno Morales was responsible for causing Soto Arriví's death.  Moreno Morales was charged with lying when he disavowed knowledge of the events at Cerro Maravilla.  He now admits not only to knowing what took place, but to killing one of the *independentistas*.  A new trial that considers the recantation would also consider the confession, and in all likelihood Moreno Morales would again be found guilty of perjury

-17-

and obstruction of justice.[3]  Given Moreno Morales's confession at the hearings, it is difficult to challenge the outcome of his trial.

### IV.  Conclusion

Because Moreno Morales's § 2255 petition is "inadequate on its face," there is no need for an evidentiary hearing. <u>DiCarlo</u>, 575 F.2d at 954.  We **<u>affirm</u>** the district court's dismissal of his petition.

---

[3]   At oral argument, Moreno Morales's counsel admitted that petitioner would likely have to plead guilty at retrial.