TORRUELLA, Circuit Judge
(Dissenting).
The suggestion that there are serious doubts about the reliability of Petitioner Conley’s trial because his trial was “infested with constitutional error,” maj. op. at 193 (emphasis added), is hyperbole that cannot remain unanswered. It is not to quibble about words, however, that I am forced to dissent. I simply cannot agree that Conley’s trial, which resulted in a conviction affirmed by this court on direct appeal, United States v. Conley, 186 F.3d 7 (1st Cir.1999), cert. denied, 529 U.S. 1017, 120 S.Ct. 1417, 146 L.Ed.2d 310 (2000) (Conley I), is unworthy of confidence by reason of the Government’s failure to disclose the April 9, 1997 FBI Memorandum of an interview with Police Officer Richard Walker.
Although I commend the thankless efforts of the district judge in having to plow through the record of this case as required by the instructions of the en banc court, Conley v. United States, 323 F.3d 7 (1st Cir.2003) (en banc) (Conley V), and further compliment his outstanding professional diligence, I do not believe his conclusions are entitled to any particular deference on appeal. The matter before us is, after all is said and done, strictly a question of law which we are required to review de novo. Moreno-Morales v. United States, 334 F.3d 140, 145-48 (1st Cir.2003) (reviewing de novo Brady materiality claims stemming from a § 2255 petition). Again, with due respect to the district judge who was put in the unenviable position of having to review a cold record of a case which was not tried before him, he was in no better position than we are to determine the lone issue before us: whether the Government’s failure to produce “the FBI memorandum, viewed in the context of the entire record, undermines confidence in the outcome of Petitioner’s trial,” maj. op. at 190 (emphasis added). Cf. Conley V, 323 F.3d at 16-18 (Bownes, J., dissenting), 23 (Torruella, J., dissenting).
I respectfully but firmly disagree with the result reached by the district court, affirmed by the majority, that the Government’s failure to disclose the FBI Memorandum undermines confidence in the jury’s verdict of guilty. On the contrary, I believe that there is no reasonable probability that had the FBI Memorandum been produced, a verdict absolving Petitioner would have resulted. Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). More on point, I am unable to conclude that there is “a probability sufficient to undermine confidence in the [verdict],” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (citation omitted), reached more than eight years ago by a jury of Conley’s peers. I am much afraid that the undermining that comes to mind is the negative perception likely to arise from the litany of maneuvers that have taken place in this case to overturn what was a just and constitutionally sound verdict.
The following is what was established, in the context of the whole record,[8] beyond a reasonable doubt. On January 25, 1995, following a shooting in the early morning *195 hours in Boston in which it was believed a police officer had been shot, there ensued a police chase of several African-American suspects in a Lexus, eventually trapping the vehicle in a dead-end street. The first police car to arrive behind the cornered Lexus was an unmarked .police car with two persons on board: one, an African-American police officer in plainclothes, Michael Cox, was wearing jeans, a black hooded sweatshirt, and a black down jacket; the other,' Charles Bullard, a civilian security officer from the scene of the shooting.
Cox, the first out of the unmarked police vehicle, proceeded immediately to chase Robert Brown,, who had exited the Lexus and was fleeing towards a fence to the right of that automobile. At the trial, Cox testified that he was “right behind” Brown and caught up with him as the latter was climbing over the fence. Trial Tr. I at 76-77; Trial Tr. II at 30-31. Although Cox attempted to grab Brown’s jacket, the suspect shook loose and landed on the other side of the fence. Trial Tr. I at 78; Trial Tr. II at 3-4. Brown testified that he saw a black man wearing a black hood running after him as he ran toward the fence, and that he felt someone touch his foot as he attempted to scale the fence, id. at 94,‘ 96. In his haste to escape in the dark, Brown hit a tree, splitting a tooth in the process. Id. at 97.
As Brown got up to run away, he looked back and saw a black man trying to climb over the fence, id., at which point that person was struck from behind with a blunt object by police officers who had just arrived. Id. at 98-101. Once, Cox was on the ground, these officers beat and kicked Cox repeatedly in the head, back, face, and mouth. Someone then shouted “stop, he’s a cop,” and the officers quickly dispersed. No one came to Cox’s aid. Thus commenced the “blue wall of silence” that leads to this case.
Brown testified at trial that before the assaulters disappeared, and while Cox was being hammered, he made eye contact with a tall white police officer who was standing next to the officers beating the man in the hood. Id. at 102. Thereafter, Brown attempted to escape, running almost a mile before he was physically captured by this same tall white officer, who turned out to be Petitioner Conley. Id. at 103-04, 239-41. During the course of the foot chase, Conley had dropped his radio, which was recovered by Police Officer Walker and was handed personally to Conley, as Walker had run behind Conley after Brown. Id. at 36-37.
The above evidence was more than sufficient to sustain the perjury and obstruction of justice counts which resulted from Conley’s grand jury testimony to the effect that (1) he chased Brown to the fence, (2) he did not observe anyone between himself and Brown, and (3) he pursued Brown over the fence. See Conley I, 186 F.3d at 7.
Up to this point, I have purposely omitted mention of Walker’s various versions of. that night’s events because although sufficiency of the evidence is not, or theoretically, should not, be the test, Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995),[9] the fact is that the Government’s case was just as strong *196 against Conley irrespective of any alleged Brady flaws, which I do not believe exist.
At trial, Walker, an African-American police officer, testified that he arrived at the scene in a patrol car behind the car of Cox, whom he knew. Walker saw Cox chase Brown “three feet behind him,” id. at 30-31, saw the latter go over the fence while Cox tried to grab him, id. at 76, and observed Cox come back down while Brown landed on the other side of the fence. He did not testify to seeing anything further, including anyone beating Cox. He did, however, testify that he handed Conley his lost radio after helping Conley in Brown’s chase, id. at 36-37, an important bonding link with Conley, as we shall point out, which made his impeachment by Conley unlikely.
Walker-related evidence, however, did not end here. The Boston Police Department’s Internal Affairs Division (IAD) conducted its own investigation into this sordid affair, during the course of which Walker had informed the IAD that he had observed a police officer behind Cox, but could not identify him, an observation which he later retracted. Moreover, during the course of testifying before the same grand jury that questioned Conley, Walker was asked to explain the prior inconsistencies in his testimony before the IAD, a matter that will be covered in more detail presently. Suffice it to say that for now, Walker’s grand jury testimony was in the defense’s possession, and they chose not to use it for strategic reasons.
The majority’s affirmance of the district court’s issuance of a writ of habeas corpus, which action is based solely on the Government’s failure to produce in the FBI Memorandum,[10] is flawed because of the following reasons: (1) this document is cumulative of Walker’s grand jury testimony which Conley possessed before trial, but refrained from using for strategic purposes, United States v. Garcia-Torres, 341 F.3d 61, 70 (1st Cir.2003) (“[Ijmpeachment evidence that is merely cumulative ... is insufficient to establish prejudice under Brady ”) (internal quotation and quotation marks omitted); Moreno-Morales, 334 F.3d at 148 (same); and (2) it is well-established that nondisclosure fails to warrant a new trial under Brady because Walker’s testimony was substantially corroborated by both Cox and Brown. Strickler, 527 U.S. at 293-94, 119 S.Ct. 1936 (failure to disclose impeachment evidence does not contravene Brady where other witnesses provide corroborating evidence in support of conviction); Garcia-Torres, 341 F.3d at 71 (same).
I
To conclude that the possible impeachment value of the FBI Memorandum is cumulative of Walker’s grand jury testimony, one need only place them side by side and read their contents:

Grand Jury Testimony

April 1997
Q: [D]id you see anyone behind Officer Cox as he was going through the fence?
A: No, I didn’t.
Q: So, why did you say that you did to Internal Affairs?
A: At the time of the interview with Internal Affairs ... I started feeling guilty, like I should have seen more than what really happened. Okay? I sat there, and I’m conjuring up pictures of what he was asking me and what I *197 should have seen. Like I said, I felt guilty not seeing more than what I saw and should have, but my attention was focused on chasing this guy towards the fence. Okay? [the IAD officer] asked the question, “Did I. see anyone,” or whatever the question was, and I was sitting there saying that from where I was, maybe I should have seen someone, and told him, “Yes, I did.” That’s the reason for my answer.
Q: And why were you feeling guilty?
A: Like I said, I should have seen, things are happening directly in front of you, and you’re sitting there saying, there are four people in this room, but I only saw two. It shouldn’t be that way. I should have seen all four people. It was right in front of me.
Tr. Vol. II at 235-36.

FBI Memorandum

April 9, 1997
According to WALKER, he saw victim and suspect running to fence and saw suspect get over the fence. He now states that he did not see anyone running behind victim. He only saw victim COX behind suspect. During Internal Affairs interview and Suffolk County GJ, WALKER stated that he saw someone behind Victim but could not identify this person or give a description of the individual other than to say it was a police officer. During pre-grand jury interview he states that he did not see anyone but felt compelled during the IAD interview to say he saw something. He felt this way because he knows victim and likes victim he felt bad that he could not say what happened and therefore convinced himself that he actually saw someone or something. But since that interview he has convinced himself that he did not actually see anyone behind victim or anyone hit victim. WALKER also suggested that perhaps if he was hypnotised [sic] he might truly recall what was going on versus what he indicates was tunnel vision.
During the pre-FGJ interview, WALKER indicated he would be willing to take a polygraph to clear up this discrepancy.
.Walker’s grand jury testimony contained all the information Conley needed to thoroughly impeach Walker’s credibility as a witness: (1) he admitted to having given false information to the IAD about seeing someone behind Cox at the fence, while “now” he was saying he had not seen anyone; (2) he explained that he did this because he was feeling “guilty at not seeing more than what he saw and should have;” and (3) by stating that he “should have seen things happening directly in front” of him, but did not, he was at a minimum indicating his poor qualities as a witness.
The FBI Memorandum adds little to •this information. As in (1), above, Walker admitted to having told IAD that he saw someone ■ behind Brown, but since then convinced himself “that he did not see anyone running behind [Cox]. He only saw ... Cox behind [Brown].!’ Similarly, as in (2), above, Walker explained this discrepancy because he “felt compelled during the IAD to say he saw something ... because he knows [Cox] and likes [him] .,. [and thus] felt bad that -he could not say what happened.”
Thus, the essential ammunition needed by Conley to attack Walker’s credibility as a prosecution witness was practically identical in both his grand jury testimony and the FBI Memorandum summarizing his statement to that agency.
We are thus left with two' pieces of information contained in the FBI Memorandum that were not previously known: (1) Walker’s cryptic hypnotism statement; and (2) his willingness to submit to a poly *198 graph test. These evidence are at best de minimis when compared with the powerful evidence in Conley’s hands which showed that Walker had changed his testimony, not on a collateral, insubstantial issue, but on a critical question that went to the heart of the Government’s case against Conley: his presence or absence from the scene of the assault against Cox.
The fact of the matter is that Conley’s defense chose not to impeach Walker with his prior inconsistent statements, and for good reason. Conley needed Walker’s trial testimony to the effect that he had seen a police officer at the bottom of the hill who fit Conley’s description, thus placing Conley elsewhere than at the scene of Cox’s beating. This was not just a question of passively failing to cross-examine Walker regarding his changes of heart. Conley’s defense actually objected to the Government’s attempt to introduce Walker’s prior inconsistent statement, see Trial Tr. II at 51-52, and vigorously relied on-his credibility in an attempt to establish by circumstantial evidence during his cross-examination (through evidence of the dropped and recovered radio), as well as during closing arguments, that Conley was the officer Walker saw at the bottom of the hill.
An argument first appearing in the district court’s opinion, Conley VI, 332 F.Supp.2d at 316, adopted by the majority, maj. op. at 191, articulates a new Brady rule regarding distinctions between the kind of impeachment evidence provided by the FBI Memorandum (Walker’s recall ability) versus that in his grand jury testimony (Walker’s bias towards Cox). It is an argument never made by Conley’s attorneys throughout the catalogue of initial actions and appeals in this case, from the trial through the initial habeas corpus proceedings, and which no amount of judicial voyeurism should be able resurrect. See, e.g., Playboy Enters. v. Public Serv. Comm’n, 906 F.2d 25, 40 (1st Cir.), cert. denied, 498 U.S. 959, 111 S.Ct. 388, 112 L.Ed.2d 399 (1990) (“An appellant waives any issue which it does not adequately raise in its initial brief’); United States v. Benavente Gomez, 921 F.2d 378, 386 (1st Cir.1990) (arguments not raised in opening appellate brief are waived); KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 25 (1st Cir.2003) (same).
Furthermore, the “ability to recall” versus “bias” distinction is one that fails to have any relevance to the facts of this appeal. Before the grand jury, Walker stated that “[he] should have seen” what was happening directly in front of him. What is that if not excellent material'with which to attack a witness’s ability to recall or perceive what took place at the fence ' that fateful night? I simply cannot agree with the majority that the grand jury “transcripts did not ... provide Petitioner with any basis to impeach Walker’s ability , to recall.” Maj. op. at 192. The grand jury testimony, like the FBI memorandum, mentions that contrary to Walker’s prior statements, he now believes that he did not see anyone running behind Brown, which pertains to Walker’s ability to recall.[11] Yet, as explained, Conley’s defense *199 simply had no desire to take this counterproductive attack against Walker: Conley needed Walker’s testimony about seeing a person resembling Conley at the bottom of the hill to show that Conley did not see the officers beat Cox, thereby rebutting allegations that he committed perjury in testifying that he had not seen the beating (Count 2).
It defies all logic to now claim that it was in Conley’s interest to impeach Walker with the information in the FBI Memorandum, most of which he already possessed. Conley knew the following: (1) Walker and Cox were friends; (2) Walker felt guilty about not seeing more; (3) this guilt led to Walker making prior inconsistent statements; and (4) Walker believed that an “Officer Ryan,” rather than Conley, was the officer who arrested Brown (another important memory lapse, but one which Conley did not wish to challenge).
I cannot conceive how.any court can conclude that the failure to produce the FBI Memorandum undermines confidence in the outcome of Conley’s trial. The facts in this case pale when compared with, for example, those in Moreno-Morales, 334 F.3d at 140. In that case, in which Brady relief was denied, we held that confidence in the outcome of the trial was not undermined notwithstanding the prosecutor’s failure to reveal thirteen polygraph examinations by a key government witness who recanted in his testimony. Id. at 145-48. We reasoned that because the inconsistencies had been, known by the defense through grand jury transcripts which it possessed yet chose not to use — a situation almost identical to the present one — the uncovered evidence “would have been merely cumulative, and ‘the unavailability of cumulative evidence does not deprive the defendant of due process’ ” under Brady. Id. at 147-48, (citing United States v. Sanchez, 917 F.2d 607, 618 (1st Cir.1990); Zeigler v. Callahan, 659 F.2d 254, 266 (1st Cir.1981)). Similarly, in United States v. Sepulveda, 15 F.3d 1216 (1st Cir.1993), we found that although the withheld evidence of a “government deal” would have discredited a government witness and was therefore “potentially useful to the defense,” id. at 1220, we nonetheless held that it was “not enough” to undermine confidence in the outcome since “all the material for making that assessment was available to the jury, and the new information ... added very little,” id. at 1221. See also United States v. Garcia-Torres, 341 F.3d 61 (finding that although a withheld evidence would have undermined a witness’s credibility, it had “weak eviden-tiary value” and “substantial other evidence” supported the verdict and thus failed to undermine confidence in the verdict). Given our circuit precedent, I simply fail to see how the withheld evidence in this case, given its cumulative nature and weak evidentiary value, should at all undermine our confidence in the verdict.
II
Equally important for Brady purposes, Walker’s testimony is fully corroborated by valid, interlocking evidence, which makes the alleged Brady violation harmless. See Strickler, 527 U.S. at 293-94, *200 119 S.Ct. 1936; Garcia-Torres, 341 F.3d at 77.
As has been previously outlined, both Cox and Brown provided ample corroborating evidence at trial concerning the timing of Cox’s pursuit of Brown at the fence, directly contradicting Conley’s grand jury testimony. The testimonies of Cox and Brown not only complement of each other, but they are in critical agreement with Walker’s core testimony describing Cox’s chase of Brown to the fence. Cox testified that he was right behind Brown as he pursued Brown to the fence, Trial Tr. I at 77-78, that there was no one between him and Brown when Brown reached the fence and climbed it, id. at 85, 88, and that he tried unsuccessfully to pull Brown down from the fence, id. at 129-130; Trial Tr. II at 14. Substantially equally, Brown testified that a black man wearing black clothing (a description matching Cox that night) ran after him as he was running toward the fence, id. at 94, and that he felt someone touch his foot as he was scaling the fence, id. at 95-96, 125. Walker’s testimony duplicates Cox’s and Brown’s accounts: he saw Cox “three feet behind” a black male suspect, who climbed the fence while Cox reached for him. Id. at 30-31, 76. On this, Conley stated to the grand jury:
Q: Did you see anyone else in plain clothes behind [Brown] as he went towards the fence?
A: No, I did not.
Q: Did you see, as he went on top of the fence or climbed the fence, another individual in plain clothes standing there, trying to grab him?
A: No, I did not.
Q: —as he went over the 'fence?
A. No, I did not.
Q: So that didn’t happen; is that correct? Because you saw the individual [Brown] go over the fence?
A: Yes, I seen [sic] go over the fence.
Q: And if these other things that I’ve been describing, a second — another plainclothes officer chasing [Brown], and actually grabbing him as he went to the top of the fence, you would have seen that if it had happened; is that your testimony?
A: I think I would have seen that.
Trial Tr. II at 235-36.
With all due respect to my various colleagues on both the district and appellate courts, who studiously and repeatedly have had to read through the evidence in this case,’they need not have gone any further than the above to have reached the conclusion which is self evident: there was ample, credible, corroborating evidence with which to sustain Conley’s flagrant perjury and obstruction of justice. ■
Although I have previously raised this concern, see Conley V, 323 F.3d at 25 n. 14 (Torruella J., dissenting), I cannot close this dissent without commenting on the unjustified denigration of the Government’s case by reason of its reliance on circumstantial evidence. Cf. United States v. Gamache, 156 F.3d 1, 8 (1st Cir.1998) (“circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given”); United States v. Hughes, 211 F.3d 676, 681 (1st Cir.2000) (same). This unfortunate trend was initially commenced by the en banc court, id. at 190, was predictably continued by the district court, Conley VI, 332 F.Supp.2d at 324, and has ultimately been crowned by the majority in this opinion, maj. op. at 190 -191, whose' blistering attack on Cox, Walker, and Brown would almost lead me to conclude that Cox assaulted himself were it not that I also have some knowledge of the evidence in this case. Despite repeated attempts during cross-examina *201 tion to challenge Cox’s ability to recall the events of the night in question, Trial Tr. I at 102-03, 107-09, 117-25, 129, as well as Brown’s credibility, Trial Tr. II at 130, 145-54, the jury convicted Conley of perjury and obstruction of justice. Of course, Conley wisely chose not to cross-examine Walker in the manner that he did Cox and Brown despite having all the ammunition that he needed to do so. Lastly, a point that has been consistently downplayed, if not outright overlooked, by my colleagues, Brown’s testimony placing Conley at the fence while Cox was being beaten is anything but circumstantial evidence, a point conceded in Petitioner’s brief, Brief for Petitioner at 6 n. 4, although it is allegedly discounted because of Conley’s acquittal on Count 2.[12] What is apparently neglected by this contention is that Conley’s presence at the fence is also relevant to placing in context his perjured testimony to the effect that there was no one other than himself at the fence.
The circumstantial evidence argument is a red herring that obfuscates the fact that Brady analysis does not allow for a retrial of the case under the guise of a § 2255 proceeding, as the majority in effect does. See also Conley VI, 332 F.Supp.2d at 324. This Court, in affirming Conley’s conviction on direct appeal, deemed the circumstantial evidence sufficient. Conley I, 186 F.3d at 7. Nor did we find Walker’s testimony to be the “linchpin” that Conley, and the majority, now makes it out to be. Maj. op. at 190. Because Cox and Brown were describing what actually happened to them at the fence, as opposed to Walker’s eyewitness account of the events, the testimonies of Cox and Brown were just as crucial as Walker’s. More importantly, the time for challenging the sufficiency of the evidence is long past. Kyles, 514 U.S. at 434, 115 S.Ct. 1555 (determining materiality under Brady is “not a sufficiency of evidence test”).
As Judge Bownes stated in his cogent dissent, in language familiar to those who have charged juries on a regular basis, “[Cjircumstantial evidence is just as reliable as testimony and at times, more reliable because it does not depend on the memory or judgment of what a witness saw and remembered and it is not subject to the biases and prejudices that are part of all human beings.” Conley V, 323 F.3d at 18 (Bownes, J., dissenting). I suspect that this new “Conley rule” of circumstantial evidence will be a bounteous field for the myriad of defendants who up to now have been charged and successfully convicted as a matter of course on such evidence.
For the reasons stated, I respectfully dissent.

. I will only recount the minimum relevant facts.

. This is a'rule which has been subtly but effectively ignored by both this Court, and more recently as a result of its instructions, by the district court. See Conley v. United States, 332 F.Supp.2d at 313 (Conley VI) (“Some a priori evaluation of the verdict appears neces-saiy, given the First Circuit's admonition that’[t]he government's evidence at trial was assuredly adequate for conviction, but ....' "); see also id. at 324 ("Holes in the Trial Testimony”).

. "[W]ere it not for the FBI memorandum, this Court would have denied the writ, even considering the variety of undisclosed items taken together.” Conley VI, 332 F.Supp.2d at 324.

. The cases cited by the majority for the proposition that "suppressed impeachment evidence 'can be immaterial because of its cumulative nature only if the witness was already [or could have been] impeached at trial by the same kind of evidence,’ " maj. op. at 192 (citing United States v. Cuffie, 80 F.3d 514 (D.C.Cir.1996); United States v. O’Conner, 64 F.3d 355, 359 (8th Cir.1995)), are inapposite. In Cuffie, the Court, immediately prior to citing this proposition, stated that "we must look not to the ways defense counsel was able to impeach [the witness], but to the ways in which the witness’ testimony was allowed to stand unchallenged." 80 F.3d at 518 (citations omitted). The Court reasoned *199 that although the witness was impeached on other grounds, "[n]one of the impeachment that defense counsel conducted ... related to petjuty[,] ... an infirmity in [the witness'] testimony that is almost unique in its detrimental effect on a witness' credibility.” Id. Here, Conley's defense self-servingly chose not to impeach Walker's credibility with his ability to recall, although Conley could have certainly done so: both the grand jury testimony and FBI memorandum, for example, raise doubts on Walker's ability to recall because contrary to. his prior statements, he now believes that he did not see anyone running behind Brown.

. I cannot agree with the majority's assertion that Conley’s acquittal on Count 2 (i.e., for testifying that he did not observe anyone beating Cox), ostensibly means that the jury rejected Brown's testimony altogether and that Walker was the center of the government’s case. Maj. op. at 189. It could very well mean that the jury did not credit that part of Brown's testimony in which he said he saw Conley watch the beating of Cox — a part of Brown’s testimony that was neither corroborated by Cox nor Walker. The rest of Brown’s testimony, however, was corroborated by both Cox and Walker.