# United States Court of Appeals
## For the First Circuit

No. 04-2424

KENNETH M. CONLEY,

Petitioner, Appellee,

v.

UNITED STATES OF AMERICA,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Baldock,* Senior Circuit Judge

Saul M. Pilchen, with whom Robert S. Bennett, Jonice Gray Tucker, Robert W. Scheef, and Thomas J. Dougherty, were on brief for appellee.

Bradly J. Schlozman, Deputy Assistant Attorney General, with whom R. Alexander Acosta, Assistant Attorney General, Mark L. Gross, and Teresa Kwong, were on brief for appellant.

July 20, 2005

---

* Of the Tenth Circuit Court of Appeals, sitting by designation.

**BALDOCK, Senior Circuit Judge**.  The question in this appeal is whether the Government's suppression of impeachment evidence violated Petitioner Kenneth Conley's right to due process under the Fifth Amendment.[1]  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  The district court answered yes and granted Petitioner's motion to set aside his conviction.  See 28 U.S.C. § 2255.  We have jurisdiction, id. § 2253(a), and affirm.

## I.

The historical facts of this case are well known and need not be repeated in full.  See United States v. Conley, 186 F.3d 7, 11-15 (1st Cir. 1999) (Conley I); United States v. Conley, 103 F. Supp. 2d 45, 49-51 (D. Mass. 2000) (Conley II); United States v. Conley, 249 F.3d 38, 40-43 (1st Cir. 2001) (Conley III); Conley v. United States, 164 F. Supp. 2d 216, 217-21 (D. Mass. 2001) (Conley IV); Conley v. United States, 323 F.3d 7, 9-11 (1st Cir. 2003) (en banc) (Conley V); Conley v. United States, 332 F. Supp. 2d 302, 306-309 (D. Mass. 2004) (Conley VI); see also Dwan v. City of Boston, 329 F.3d 275, 276-77 (1st Cir. 2003).  In 1995, police officers chased four homicide suspects through Boston.  The vehicle chase ended when the suspects turned into a cul-de-sac (Woodruff

---

[1] The Government's good faith (or lack thereof) in failing to disclose favorable evidence is irrelevant. Brady v. Maryland, 373 U.S. 83, 87 (1963); Strickler v. Greene, 527 U.S. 263, 282 (1999). For ease of exposition, we (like the Supreme Court) refer to the Government's nondisclosure of favorable evidence as the "suppression" of evidence. See Brady, 373 U.S. at 87; Strickler, 527 U.S. at 282.

Way). The four suspects fled on foot. One of the first officers on the scene, Michael Cox, gave chase. Cox pursued one suspect, Robert Brown, towards a fence. Meanwhile, other officers arrived at the "confused and changing scene[.]" Conley V, 323 F.3d at 16. Officer Richard Walker arrived fourth; Petitioner fifth. Both Walker and Petitioner joined the foot chase. Other officers in the chase mistakenly took Cox, an undercover officer dressed in plainclothes, as a fleeing suspect. They caught Cox at the fence and proceeded to brutally beat him. The assaulting officers discovered their mistake and dispersed, leaving Cox badly injured. Petitioner ultimately apprehended Brown.

The Boston Police Department Internal Affairs Division (IAD) thereafter commenced an investigation into Cox's beating. An IAD officer interviewed Walker during the investigation. Walker informed IAD he observed Cox chase Brown towards the fence on Woodruff Way. Walker further stated that he observed a police officer behind Cox, but he could not identify the officer. Walker, however, subsequently retracted his statement about observing an officer behind Cox.

In 1997, a federal grand jury convened to determine if the officers involved in Cox's beating used excessive force in violation of federal law. See 18 U.S.C. § 242. An FBI agent interviewed Walker. According to an FBI memorandum memorializing the details of the interview, Walker agreed to take a polygraph

-4-

examination concerning his retraction of the statement about observing another officer behind Cox.  The FBI memorandum, in relevant part, states:

> [Walker] felt [compelled to say he saw something during the IAD interview] because he knows [Cox] and likes [Cox and] he felt bad that he could not say what happened and therefore convinced himself that he actually saw someone or something.  But since that interview he has convinced himself that he did not actually see anyone behind [Cox] or anyone hit [Cox].  WALKER *also suggested that perhaps if he was hypnotised* [sic] *he might truly recall what was going on versus what he indicates was tunnel vision.*

(emphasis added).  Walker subsequently refused to take a polygraph examination.

The grand jury subpoenaed Petitioner and Walker to testify during the course of its investigation.  Petitioner testified that:  he did not observe anyone beating Cox; he pursued Brown to the fence; he did not see anyone between himself and Brown; he pursued Brown over the fence and apprehended Brown.  Walker testified that:  he did not see anyone beating Cox; he observed Cox chase Brown towards the fence; he observed Brown "flip over" the fence; he observed Cox grab at Brown as he flipped over the fence; and he observed Cox come back down without clearing the fence while Brown landed on the other side of the fence.  The prosecutor also questioned Walker about his prior statement to IAD:

> Q:  [D]id you see someone behind Officer Cox as he was going through the fence?
> A:  No, I didn't.

-5-

> Q: So, why did you say that you did to Internal Affairs?
> A: At the time of the interview with Internal Affairs . . . I started feeling guilty, like I should have seen more than what really happened. . . . I sat there, and I'm conjuring up pictures of what he was asking me and what I should have seen. Like I said, I felt guilty not seeing more than what I saw and I should have, but my attention was focused on my chasing this guy towards the fence. Okay? He [the IAD officer] asked me the question, 'Did I see anyone,' or whatever the question was, and I was sitting there saying that from where I was, maybe I should have seen someone, and I told him, 'Yes, I did.' That's the reason for my answer.
> Q: And why were you feeling guilty?
> A: Like I said, I should have seen, things are happening directly in front of you, and you're sitting there saying, there are four people in this room, but I only saw two. It shouldn't be that way. I should have seen all four people. It was right in front of me.

Walker further testified he was "sure" about his grand jury testimony. The grand jury did not indict any officers for violating § 242.

A separate grand jury, however, indicted Petitioner for obstruction of justice and perjury. See 18 U.S.C. §§ 1503, 1623. The grand jury charged Petitioner with perjury for his testimony that: (1) he did not observe another individual chase Brown to the fence (count I); and (2) he did not observe anyone beating Cox (count II). The obstruction of justice charge (count III) was derivative of the other two charges. Petitioner pleaded not guilty. The Government produced Walker's grand jury transcripts

during discovery, but not the FBI memorandum. See Fed. R. Crim. P. 16(a)(1)(E).

Trial commenced in 1998. The Government presented the testimony of Cox, Walker, and Brown (the fleeing suspect) to prove Petitioner perjured himself before the grand jury. Cox testified he pursued Brown to the fence and unsuccessfully grabbed at Brown as he scaled the fence. Cox testified that no other officer was ever between himself and Brown. Walker testified he observed Cox chase Brown to the fence. Walker observed Brown scale the fence and Cox grab at him, but did not observe anything thereafter. Brown testified he observed an African-American male in black clothing (a description that fit Officer Cox) chasing him as he ran towards the fence and, as he scaled the fence, felt someone touch his foot. After scaling the fence, Brown looked back and observed police officers beating Cox. Brown made eye contact with a tall Caucasian officer (a description that fit Petitioner) who was standing next to the officers beating Cox. Brown testified the same tall white officer arrested him on the other side of the fence.

The jury convicted Petitioner on count I, finding Petitioner perjured himself when he testified he did not observe any other officer chase Brown to the fence. The obstruction of justice conviction on count III necessarily followed. The jury acquitted Petitioner on count II, finding Petitioner did not commit

perjury when he testified he did not observe any officer beating Cox. We affirmed on appeal, holding (among other things) the Government presented sufficient circumstantial evidence to convict Petitioner. Conley I, 186 F.3d at 19-20. Petitioner subsequently learned the Government failed to disclose impeachment evidence, including the FBI memorandum, in its possession prior to trial. He filed a motion for a new trial, which the district court granted. Conley II, 103 F. Supp. 2d at 58 (Keeton, J.). On appeal, we reversed because "the district court did not apply the correct legal test[,]" Conley III, 249 F.3d at 39, and ordered the execution of Petitioner's sentence. Id. at 47.

Petitioner thereafter filed the instant § 2255 motion in the district court to set aside his perjury and obstruction of justice convictions. The district court granted the motion, finding Petitioner carried his burden under Fed. R. Crim. P. 33 of showing the suppressed evidence would probably produce an acquittal upon retrial. Conley IV, 164 F. Supp. 2d at 223 (Keeton, J.); see also United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980) (establishing four elements a defendant must satisfy to be entitled to a new trial under Rule 33). On appeal, we again reversed. The en banc Court, however, withdrew the opinion when it granted Petitioner rehearing. Conley V, 323 F.3d at 11. The en banc Court held the district court incorrectly employed the Wright test when it granted Petitioner a new trial because a new-evidence claim

under <u>Wright</u> is not cognizable under § 2255.  <u>Id.</u> at 11, 13-14.
The en banc Court, therefore, vacated the district court's decision
and remanded the case for the district court to consider
Petitioner's new-evidence claim under <u>Brady</u>, which is "a settled
basis for collateral attack."  <u>Id.</u> at 14, 16.  In so doing, the en
banc Court ordered the case reassigned to a different district
judge.  <u>Id.</u> at 15.

On remand, the newly-assigned district judge faithfully
followed the <u>Conley V</u> mandate.  See <u>Conley VI</u>, 332 F. Supp. 2d at
305-306 (Young, C.J.).  The court cataloged the "new" or suppressed
evidence – the so-called "<u>Brady</u> material," <u>see</u> <u>Strickler</u> v. <u>Greene</u>,
527 U.S. 263, 281 (1999) – and then considered the evidence
individually and cumulatively.  <u>Conley VI</u>, 332 F. Supp. 2d at 310-
12, 315-24.  The court concluded the Government's failure to
disclose the FBI memorandum violated Petitioner's right to due
process under <u>Brady</u> because the document could have been used at
trial to impeach Walker.  <u>Id.</u> at 319.  The district court found the
remainder of the suppressed evidence immaterial under <u>Brady</u>.[2]  <u>Id.</u>
at 320-22.

---

[2] We do not express any opinion on the remainder of the
suppressed evidence, including Brown's booking report, because the
Government's failure to disclose the FBI memorandum warrants habeas
relief.  As the en banc Court predicted, the district court's
"well-worked-out assessment" greatly assisted our evaluation of
Petitioner's <u>Brady</u> claim.  <u>See</u> <u>Conley V</u>, 323 F.3d at 15.

II.

On appeal, the Government argues its suppression of the FBI memorandum did not prejudice Petitioner because the memorandum was cumulative of other impeachment evidence in Petitioner's possession prior to trial. The Government also claims Petitioner would not have used the FBI memorandum at trial and, if he had, he still would not have suffered any prejudice. Reviewing Petitioner's Brady claim de novo, see Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003), we reject the Government's three arguments.[3]

A.

The Fifth Amendment provides no person shall be deprived of liberty without due process. U.S. Const. amend V. In Brady, 373 U.S. at 87, the Supreme Court held the Government's suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment. To establish a Brady violation, a habeas petitioner must demonstrate: (1) the evidence

---

[3] Some tension exists within this Circuit over the proper standard of review for Brady claims raised in a § 2255 motion. The materiality question under Brady – the third Brady component going to constitutional error – is a mixed question of law and fact. Ouimette v. Moran, 942 F.2d 1, 4 (1st Cir. 1991). Some deference to the district court's resolution of fact-dominated questions in the Brady context is therefore due, even on collateral review. Cf. id.; Ellis v. United States, 313 F.3d 636, 641 (1st Cir. 2002). In Moreno-Morales, 334 F.3d at 145, however, we reviewed a Brady materiality question raised in the context of a § 2255 motion de novo. We need not resolve the tension in this case because Petitioner prevails even under the more onerous (or less deferential) de novo standard.

at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment). Strickler, 527 U.S. at 281-82.

Impeachment evidence must be material before its suppression justifies a new trial. Wood v. Bartholomew, 516 U.S. 1, 5 (1995) (per curiam). The suppression of impeachment evidence is "material" when a reasonable probability exists "that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289. A "reasonable probability" exists if the Government's evidentiary suppression undermines confidence in the verdict. Kyles v. Whitley, 514 U.S. 419, 434 (1995). "This somewhat delphic 'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal." United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993); see also United States v. Cunan, 152 F.3d 29, 34 (1st Cir. 1998) (explaining a petitioner may be entitled to a new trial under Brady without convincing the court of the certainty of a different outcome). "Thus, the law makes it easier for [habeas petitioners] to obtain a new trial where the government has engineered an unfair trial by

-11-

withholding material exculpatory [or impeachment] evidence." United States v. Josleyn, 206 F.3d 144, 153 (1st Cir. 2000).

We evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality. United States v. Bagley, 473 U.S. 667, 683 (1985); United States v. Agurs, 427 U.S. 97, 112 (1976). Impeachment evidence is important because "if disclosed and used effectively, it may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676. In other words, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]" Napue v. Illinois, 360 U.S. 264, 269 (1959). That is why, in the Brady context, the Court has repeatedly stressed "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others[.]" Kyles, 514 U.S. at 445 (citing Agurs, 427 U.S. at 112-13 & n.21).

The Government's suppression of impeachment evidence, therefore, can warrant a new trial "where the evidence is highly impeaching *or* when the witness' testimony is uncorroborated and essential to the conviction." United States v. Martinez-Medina, 279 F.3d 105, 126 (1st Cir. 2002) (emphasis added). The Supreme Court, for example, has found Brady violations where the Government failed to disclose impeachment evidence that could have been used to impugn the credibility of the Government's "key witness," see

-12-

<u>Giglio</u> v. <u>United States</u>, 405 U.S. 150, 154-55 (1972), or that could have "significantly weakened" key eyewitness testimony. <u>Kyles</u>, 514 U.S. at 441, 453. Suppressed impeachment evidence is immaterial under <u>Brady</u>, however, if the evidence is cumulative or impeaches on a collateral issue. <u>United States</u> v. <u>Dumas</u>, 207 F.3d 11, 16 (1st Cir. 2000); <u>see</u> <u>also</u> <u>Moreno-Morales</u>, 334 F.3d at 148 (finding suppressed impeachment evidence that "largely mirror[ed]" disclosed impeachment evidence immaterial); <u>United States</u> v. <u>Gonzalez-Gonzalez</u>, 258 F.3d 16, 25 (1st Cir. 2001) (finding suppressed impeachment evidence immaterial where the evidence was cumulative of *similar* disclosed impeachment evidence); <u>Barrett</u> v. <u>United States</u>, 965 F.2d 1184, 1192 (1st Cir. 1992) (same); <u>United States</u> v. <u>Sanchez</u>, 917 F.2d 607, 618 (1st Cir. 1990) (same). Suppressed impeachment evidence, if cumulative of *similar* impeachment evidence used at trial (or available to the petitioner but not used) is superfluous and therefore has little, if any, probative value. <u>United States</u> v. <u>Boyd</u>, 55 F.3d 239, 246 (7th Cir. 1995); <u>see</u> <u>also</u> Fed. R. Evid. 403 (providing cumulative evidence may be excluded even if relevant).

Similarly, suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached. <u>Cf.</u> <u>Strickler</u>, 527 U.S. at 292-94, 296. The <u>Brady</u>-materiality test is *not*, however, a sufficiency of the evidence test. <u>Id.</u> at 290;

McCambridge v. Hall, 303 F.3d 24, 37 (1st Cir. 2002) (en banc).  In Kyles, 514 U.S. at 434-35, the Supreme Court explained that a habeas petitioner "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.  The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict."

B.

In this case, the Government's suppression of the FBI memorandum violated Petitioner's right to due process under Brady.  To begin, the FBI memorandum was favorable to Petitioner because he could have used the document at trial to impeach Walker's ability to recall.  See, e.g., Dumas, 207 F.3d at 16 (recognizing "ability to recall" as a valid impeachment method).  Indeed, the FBI memorandum was "highly impeaching."  See Martinez-Medina, 279 F.3d at 126; see also Conley VI, 332 F. Supp. 2d at 316-17.  Walker's request to be hypnotized in order to "truly recall" the events preceding Cox's beating indicates, at best, that he did not remember what occurred on Woodruff Way and, at worst, that he "convinced himself" of a new version of events to protect his friend, Officer Cox.  The implication of the latter undermines Walker's testimony "[s]ince the evolution over time of a given eyewitness's description can be fatal to [his] reliability[.]" Kyles, 514 U.S. at 444; see also Moreno-Morales, 334 F.3d at 148

-14-

(acknowledging "the impeaching power of a witness's evolving story.").

Next, the Government wisely conceded it improperly suppressed the FBI memorandum. See Conley VI, 332 F. Supp. 2d at 309, 312 & n.8. While new trials are not granted under Brady to punish prosecutors, see Agurs, 427 U.S. at 110, we need not entirely ignore the Government's failure to disclose evidence. See Sepulveda, 15 F.3d at 1220. As Judge Posner explained, the "gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful without such tactics the defendants might be acquitted." Boyd, 55 F.3d at 241.

We thus turn to the dispositive materiality inquiry. The question is whether the Government's suppression of the FBI memorandum, viewed in the context of the entire record, undermines confidence in the outcome of Petitioner's trial. The Government presented the testimony of Cox, Walker, and Brown to prove Petitioner perjured himself when he denied seeing Cox pursue Brown (count I). The trio's testimony provided sufficient evidence to convict Petitioner.[4]  See Conley I, 186 F.3d at 19-20; Conley V,

---

[4] The dissent, no doubt, applies a sufficiency of the evidence test to conclude the Government's suppression of the FBI memorandum was immaterial. See dissent op. at 4, 16. The dissent's

-15-

323 F.3d at 16. The weakness in the Government's case, however, "lies in the absence of any direct evidence as to what [Petitioner] in fact observed during the early morning hours of January 25, 1995 in the cul-de-sac at the end of Woodruff Way." Conley I, 186 F.3d at 19; see also Conley V, 323 F.3d at 16 (explaining the Government's evidence at trial was "always circumstantial because no one testified that he or she *saw* [Petitioner] looking at Cox in pursuit of Brown and [Petitioner] never admitted seeing him."); Conley VI, 332 F. Supp. 2d at 324 (detailing the troubling aspects of the Government's "highly circumstantial" case). The Government's case, therefore, hinged entirely on the credibility of its witnesses. See Conley I, 186 F.3d at 20; Conley IV, 164 F. Supp. 2d at 223; Conley V, 323 F.3d at 16.

Cox, as the district court recognized, "was an extraordinarily sympathetic victim – a Boston police officer struck down in the line of duty, viciously beaten and permanently injured by fellow officers." Conley VI, 332 F. Supp. 2d at 315. Cox's testimony, however, raised serious problems for the Government. For example, Cox testified (unlike any other witness) that "[he] saw two [suspects] run towards the fence[.]" The Government explained this discrepancy in closing by arguing a "concussion" may

application of the incorrect legal test leads, unsurprisingly, to its indignation, id. at 2, ability to distinguish analogous cases, id. at 12 n.4, parade of horribles, id. at 18-19, and bewilderment concerning today's holding, id. at 13, 16.

-16-

have affected Cox's ability to recall.  The evidence supported the Government's explanation.  Cox suffered severe head trauma as a result of the assault, losing consciousness and memory at the scene.  Thus, as the Government argued,  Cox's head trauma tragically limited the evidentiary value of his testimony.

Brown's testimony also proved problematic.  Petitioner impeached Brown with evidence of his previous felony convictions. See Fed. R. Evid. 609(a).  Brown also testified (unlike any other witness) that he observed a tall white officer – Petitioner, according to the Government – standing next to the officers beating Cox.  The jury, however, ostensibly rejected Brown's testimony about Petitioner's position at the scene of the beating because it acquitted him on count II (i.e., for testifying he did not observe anyone beating Cox).  Consequently, Brown's testimony had little, if any, corroborative value.

Given the inherent weaknesses in Cox's and Brown's testimony, the Government relied heavily upon Walker's testimony. Walker provided a critical link in the Government's chain of circumstantial evidence; namely, a disinterested eyewitness account of the chase.  See Strickler, 527 U.S. at 293 (recognizing the importance of disinterested eyewitness testimony).  A fair reading of Walker's testimony in the context of the entire record confirms that his testimony was the linchpin of the Government's case on count I.  Tellingly, the Government never argues otherwise despite

-17-

the district court's same conclusion.  See Conley VI, 332 F. Supp. 2d at 315.

Prior to trial, however, Petitioner did not know the Government's key witness previously suggested he be hypnotized to "truly recall" the events preceding Cox's beating.  Without any other *similar* material, Petitioner did not impeach Walker's ability to recall at trial.  Consequently, the Government's suppression of the FBI memorandum deprived the jury of critical information.  See Giglio, 405 U.S. at 154-55 (explaining the jury is *entitled to know* of impeachment evidence when such evidence could impugn the credibility of a key witness).  "Disclosure of [the FBI memorandum] would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."  Kyles, 514 U.S. at 441.  A cross examination of Walker that raised serious doubts about his ability to recall could have changed the course of Petitioner's trial.  Cf. United States v. Cuffie, 80 F.3d 514, 519 (D.C. Cir. 1996); Conley VI, 332 F. Supp. 2d at 316.  This is particularly true given the Government's acknowledgment to the jury of Cox's memory problems and Brown's lack of credibility.  Because Walker was essential to the Government's case, and his personal credibility potentially dispositive, the Government's suppression of the FBI memorandum may have made the difference between a conviction or acquittal of Petitioner on count I.  Bagley, 473 U.S. at 676.  The Government's suppression of the FBI memorandum

undermines confidence in Petitioner's count I conviction because a reasonable probability exists the verdict would have been different if the Government disclosed the memorandum to the defense. Kyles, 514 U.S. at 434. Therefore, the Government's suppression of the FBI memorandum was material under Brady.

C.

The Government's three arguments to the contrary are unpersuasive. First, the Government argues the FBI memorandum is immaterial under Brady because it is cumulative of Walker's properly disclosed grand jury testimony. This argument fails because, as every judge to consider the evidence has concluded, it mischaracterizes the evidence. See Conley IV, 164 F. Supp. 2d at 223 (Keeton, J.) (concluding "the newly discovered evidence is highly probative and neither immaterial nor cumulative in nature."); Conley VI, 332 F. Supp. 2d at 316 (Young, C.J.) (finding the FBI memorandum opened an entirely new, and hence not cumulative, line of cross examination); Conley V, 323 F.3d at 30-31 (Torruella, J., dissenting) (asserting the "undisclosed impeachment evidence is, for the most part, minor and cumulative[]" and then dismissing Walker's hypnotism statement as weak, but not cumulative, impeachment evidence).[5]

_____

[5] We do not read today's dissent as suggesting otherwise. To the contrary, the dissent (correctly and critically) notes the FBI memorandum contains two "pieces of information" that Petitioner did not previously know: Walker's hypnotism statement and his (un)willingness to submit to a polygraph test. See dissent op. at

-19-

We agree the FBI memorandum is not cumulative of Walker's grand jury testimony. The FBI memorandum indicates Walker was so unsure of his memory that he suggested hypnotism to "truly recall" the events antecedent to Cox's beating. By contrast, Walker's grand jury testimony indicates he was "sure" of his testimony regarding the events antecedent to Cox's beating. The grand jury transcripts indicate Walker embellished before the IAD because he wished he could have seen more, but the transcripts do not indicate that Walker could not remember what he *did* testify to seeing during the chase. Walker's grand jury transcripts thus provided Petitioner, at most, with the opportunity to impeach Walker based upon his prior inconsistent statement and bias. The transcripts did not, however, provide Petitioner with any basis to impeach Walker's ability to recall, an entirely different form of impeachment.[6] See Dumas, 207 F.3d at 16; Conley VI, 332 F. Supp. 2d at 318. We therefore reject the Government's argument because suppressed impeachment evidence "can be immaterial because of its cumulative nature *only if* the witness was already [or could have been] impeached at trial by the *same kind of evidence*." Cuffie, 80

9-10.

[6] The dissent claims that we have adopted a "new Brady rule" based upon an argument first appearing in the district court's opinion. See dissent op. at 10-11. As the dissent implicitly acknowledges, however, Petitioner argued the distinction between impeachment based on ability to recall and bias in his "opening brief" after remand in Conley V. As a result, waiver is not an issue in this case.

-20-

F.3d at 518 (emphasis added); <u>United States</u> v. <u>O'Conner</u>, 64 F.3d 355, 359 (8th Cir. 1995).

Second, the Government argues Petitioner would not have used the FBI memorandum at trial even if it had been properly disclosed. Specifically, the Government postulates Petitioner needed to embrace Walker's testimony to prove he arrested Brown, thereby distancing himself from Cox's beating for purposes of defending against the perjury charge in count II. This argument fails because its premise is flawed. Petitioner did not need to embrace Walker's testimony to establish he arrested Brown. Petitioner presented uncontroverted evidence at trial that he arrested Brown. Furthermore, the Government *never* disputed that Petitioner arrested Brown. Instead, the Government took the exact opposite approach. The prosecutor told the jury in opening that "there is no dispute in this trial that the [Petitioner] did chase Brown eventually and he eventually caught up with him and he arrested him[.]" The Government reiterated its point in closing: "[Petitioner] tells you, and the evidence is not disputed, he chase[d] a suspect from a shooting several hundred yards, he captures him at gun point, [and] he handcuffs him[.]" Further, as the district court explained, Petitioner could have impeached Walker's ability to recall what happened during the rapidly evolving situation preceding Cox's beating while simultaneously

embracing Walker's testimony during the naturally less chaotic events after Brown's arrest. Conley VI, 332 F. Supp. 2d at 318.

We also reject the Government's related argument that Petitioner would not have used the FBI memorandum to impeach Walker's ability to recall because he made a strategic decision not to use Walker's grand jury transcripts at trial. The reasons for not impeaching Walker with the grand jury transcripts are palpable from the record. Impeaching Walker with his prior inconsistent statement about observing another officer behind Cox would have permitted the Government to rehabilitate Walker on redirect with his prior consistent statement, also made under oath before the grand jury, that he did not see another officer behind Cox. See Fed. R. Evid. 801(d)(1)(B); see also Conley VI, 332 F. Supp. 2d at 315 (explaining Petitioner "could well have impeached Walker with his known instances of improper embellishment, but would inevitably have faced the [G]overnment riposte that Walker had laudably given complete testimony and ought be considered credible because he had included the details favorable to [Petitioner]."). At the same time, such questioning would have opened the door for the Government to address Walker's motive for making the inconsistent statement, namely, his sympathy for Cox. Therefore, impeaching Walker with the grand jury transcripts would have harmed more than helped Petitioner's cause. We do not ignore these realities of trial when engaged in a Brady analysis. Cf. Cunan, 152 F.3d at 35.

-22-

Third, the Government argues the FBI memorandum, even if disclosed and used at trial, is still immaterial under Brady because "Brown's and Cox's testimony provided sufficient evidence for the jury to convict [Petitioner], even without Walker's testimony."[7] Supreme Court and Circuit precedent clearly foreclose this argument. Kyles, 514 U.S. at 434; McCambridge, 303 F.3d at 37. The question is not whether Petitioner would more likely than not have received a different verdict with the FBI memorandum, but whether in the memorandum's absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles, 514 U.S. at 434. We answer no after careful review of the record.

III.

We do not take our task in this case lightly. Ordering a new trial is a drastic remedy that exacts substantial costs on the administration of justice and taxpayers. Those costs are justified, however, "where serious doubts about the reliability of

---

[7] The Government also asserts that "pointing out Walker's inconsistent statements about whether someone was behind Cox would not have directly undermined Walker's testimony that he saw Cox pursuing Brown; Walker never deviated on this point." This is true, but not true enough. See Kyles, 514 U.S. at 443 n.14. The inconsistencies between the two bodies of testimony "provided opportunities for chipping away on cross-examination but not for the assault that was warranted." Id. The Government also misses the point. Walker's entire testimony – even that from which he never deviated – could be called into question if Petitioner impeached his ability to recall the events preceding Cox's beating. The issue was Walker's credibility, not whether he actually saw someone behind Cox.

-23-

a trial infested with constitutional error exist." <u>Bartholomew</u>, 516 U.S. at 8. The district court's order granting Petitioner's motion to set aside his conviction under 28 U.S.C. § 2255 is therefore

AFFIRMED.

**-- Dissent follows. --**

**TORRUELLA**, <u>Circuit Judge</u> **(Dissenting).**   The suggestion that there are serious doubts about the reliability of Petitioner Conley's trial because his trial was "<u>infested</u> with constitutional error," <u>maj. op.</u> at 22 (emphasis added), is hyperbole that cannot remain unanswered.   It is not to quibble about words, however, that I am forced to dissent.   I simply cannot agree that Conley's trial, which resulted in a conviction affirmed by this court on direct appeal, <u>United States</u> v. <u>Conley</u>, 186 F.3d 7 (1st Cir. 1999), <u>cert. denied</u>, 529 U.S. 1017 (2000) (<u>Conley I</u>), is unworthy of confidence by reason of the Government's failure to disclose the April 9, 1997 FBI Memorandum of an interview with Police Officer Richard Walker.

Although I commend the thankless efforts of the district judge in having to plow through the record of this case as required by the instructions of the <u>en banc</u> court, <u>Conley</u> v. <u>United States</u>, 323 F.3d 7 (1st Cir. 2003) (<u>en banc</u>) (<u>Conley V</u>), and further compliment his outstanding professional diligence, I do not believe his conclusions are entitled to any particular deference on appeal. The matter before us is, after all is said and done, strictly a question of law which we are required to review <u>de novo</u>.   <u>Moreno-Morales</u> v. <u>United States</u>, 334 F.3d 140, 145-48 (1st Cir. 2003) (reviewing <u>de novo</u> <u>Brady</u> materiality claims stemming from a § 2255 petition).   Again, with due respect to the district judge who was put in the unenviable position of having to review a cold record of a case which was not tried before him, he was in no better position

-25-

than we are to determine the lone issue before us: whether the Government's failure to produce "the FBI memorandum, underline(viewed in the context of the entire record), undermines confidence in the outcome of Petitioner's trial," maj. op. at 14 (emphasis added). Cf. Conley V, 323 F.3d at 16-18 (Bownes, J., dissenting), 23 (Torruella, J., dissenting).

I respectfully but firmly disagree with the result reached by the district court, affirmed by the majority, that the Government's failure to disclose the FBI Memorandum undermines confidence in the jury's verdict of guilty. On the contrary, I believe that there is **no** reasonable probability that had the FBI Memorandum been produced, a verdict absolving Petitioner would have resulted. Strickler v. Greene, 527 U.S. 263, 281 (1999). More on point, I am unable to conclude that there is "a probability sufficient to undermine confidence in the [verdict]," United States v. Bagley, 473 U.S. 667, 682 (1985) (citation omitted), reached more than eight years ago by a jury of Conley's peers. I am much afraid that the undermining that comes to mind is the negative perception likely to arise from the litany of maneuvers that have taken place in this case to overturn what was a just and constitutionally sound verdict.

The following is what was established, in the context of the whole record,[8] beyond a reasonable doubt. On January 25, 1995,

---

[8]I will only recount the minimum relevant facts.

-26-

following a shooting in the early morning hours in Boston in which it was believed a police officer had been shot, there ensued a police chase of several African-American suspects in a Lexus, eventually trapping the vehicle in a dead-end street. The first police car to arrive behind the cornered Lexus was an unmarked police car with two persons on board: one, an African-American police officer in plainclothes, Michael Cox, was wearing jeans, a black hooded sweatshirt, and a black down jacket; the other, Charles Bullard, a civilian security officer from the scene of the shooting.

Cox, the first out of the unmarked police vehicle, proceeded immediately to chase Robert Brown, who had exited the Lexus and was fleeing towards a fence to the right of that automobile. At the trial, Cox testified that he was "right behind" Brown and caught up with him as the latter was climbing over the fence. Trial Tr. I at 76-77; Trial Tr. II at 30-31. Although Cox attempted to grab Brown's jacket, the suspect shook loose and landed on the other side of the fence. Trial Tr. I at 78; Trial Tr. II at 3-4. Brown testified that he saw a black man wearing a black hood running after him as he ran toward the fence, and that he felt someone touch his foot as he attempted to scale the fence, id. at 94, 96. In his haste to escape in the dark, Brown hit a tree, splitting a tooth in the process. Id. at 97.

As Brown got up to run away, he looked back and saw a black man trying to climb over the fence, id., at which point that person was struck from behind with a blunt object by police officers who had just arrived. Id. at 98-101. Once Cox was on the ground, these officers beat and kicked Cox repeatedly in the head, back, face, and mouth. Someone then shouted "stop, he's a cop," and the officers quickly dispersed. No one came to Cox's aid. Thus commenced the "blue wall of silence" that leads to this case.

Brown testified at trial that before the assaulters disappeared, and while Cox was being hammered, he made eye contact with a tall white police officer who was standing next to the officers beating the man in the hood. Id. at 102. Thereafter, Brown attempted to escape, running almost a mile before he was physically captured by this same tall white officer, who turned out to be Petitioner Conley. Id. at 103-04, 239-41. During the course of the foot chase, Conley had dropped his radio, which was recovered by Police Officer Walker and was handed personally to Conley, as Walker had run behind Conley after Brown. Id. at 36-37.

The above evidence was more than sufficient to sustain the perjury and obstruction of justice counts which resulted from Conley's grand jury testimony to the effect that (1) he chased Brown to the fence, (2) he did not observe anyone between himself and Brown, and (3) he pursued Brown over the fence. See Conley I, 186 F.3d at 7.

-28-

Up to this point, I have purposely omitted mention of Walker's various versions of that night's events because although sufficiency of the evidence is not, or theoretically, should not, be the test, <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434 (1995),[9] the fact is that the Government's case was just as strong against Conley irrespective of any alleged <u>Brady</u> flaws, which I do not believe exist.

At trial, Walker, an African-American police officer, testified that he arrived at the scene in a patrol car behind the car of Cox, whom he knew. Walker saw Cox chase Brown "three feet behind him," <u>id.</u> at 30-31, saw the latter go over the fence while Cox tried to grab him, <u>id.</u> at 76, and observed Cox come back down while Brown landed on the other side of the fence. He did not testify to seeing anything further, including anyone beating Cox. He did, however, testify that he handed Conley his lost radio after helping Conley in Brown's chase, <u>id.</u> at 36-37, an important bonding link with Conley, as we shall point out, which made his impeachment by Conley unlikely.

---

[9] This is a rule which has been subtly but effectively ignored by both this Court, and more recently as a result of its instructions, by the district court. <u>See</u> <u>Conley</u> v. <u>United States</u>, 332 F. Supp. 2d at 313 (<u>Conley VI</u>) ("Some <u>a priori</u> evaluation of the verdict appears necessary, given the First Circuit's admonition that '[t]he government's evidence at trial was assuredly adequate for conviction, but . . . .'"); <u>see also</u> <u>id.</u> at 324 ("Holes in the Trial Testimony").

Walker-related evidence, however, did not end here. The Boston Police Department's Internal Affairs Division (IAD) conducted its own investigation into this sordid affair, during the course of which Walker had informed the IAD that he had observed a police officer behind Cox, but could not identify him, an observation which he later retracted. Moreover, during the course of testifying before the same grand jury that questioned Conley, Walker was asked to explain the prior inconsistencies in his testimony before the IAD, a matter that will be covered in more detail presently. Suffice it to say that for now, Walker's grand jury testimony was in the defense's possession, and they chose not to use it for strategic reasons.

The majority's affirmance of the district court's issuance of a writ of habeas corpus, which action is based <u>solely</u> on the Government's failure to produce in the FBI Memorandum,[10] is flawed because of the following reasons: (1) this document is cumulative of Walker's grand jury testimony which Conley possessed before trial, but refrained from using for strategic purposes, <u>United States</u> v. <u>García-Torres</u>, 341 F.3d 61, 70 (1st Cir. 2003) ("[I]mpeachment evidence that is merely cumulative . . . is insufficient to establish prejudice under <u>Brady</u>") (internal quotation and quotation marks omitted); <u>Moreno-Morales</u>, 334 F.3d at

_____

[10]"[W]ere it not for the FBI memorandum, this Court would have denied the writ, even considering the variety of undisclosed items taken together." <u>Conley VI</u>, 332 F. Supp. 2d at 324.

148 (same); and (2) it is well-established that nondisclosure fails to warrant a new trial under <u>Brady</u> because Walker's testimony was substantially corroborated by both Cox and Brown. <u>Strickler</u>, 527 U.S. at 293-94 (failure to disclose impeachment evidence does not contravene <u>Brady</u> where other witnesses provide corroborating evidence in support of conviction); <u>García-Torres</u>, 341 F.3d at 71 (same).

**I**

To conclude that the possible impeachment value of the FBI Memorandum is cumulative of Walker's grand jury testimony, one need only place them side by side and read their contents:

| Grand Jury Testimony | FBI Memorandum |
|---|---|
| April 1997 | |
| | April 9, 1997 |

Grand Jury Testimony April 1997

Q: [D]id you see anyone behind Officer Cox as he was going through the fence?
A: No, I didn't.
Q: So, why did you say that you did to Internal Affairs?
A: At the time of the interview with Internal Affairs . . . I started feeling guilty, like I should have seen more than what really happened. Okay? I sat there, and I'm conjuring up pictures of what he was asking me and what I should have seen. Like I said, I felt guilty not seeing more than what I saw and should have, but my attention was focused on chasing this guy towards the fence. Okay? [the IAD officer] asked the question,"Did I see anyone," or whatever the question was, and I was sitting there saying that from where I was, maybe I should have seen someone, and told him, "Yes, I did." That's the reason for my answer.
Q: And why were you feeling guilty?
A: Like I said, I should have seen, things are happening directly in front of you, and you're sitting there saying, there are four people in this room, but I only saw two. It shouldn't be that way. I should have seen all four people. It was right in front of me.

Tr. Vol. II at 235-36.

FBI Memorandum April 9, 1997

According to WALKER, he saw victim and suspect running to fence and saw suspect get over the fence. He now states that he did not see anyone running behind victim. He only saw victim COX behind suspect. During Internal Affairs interview and Suffolk County GJ, WALKER stated that he saw someone behind Victim but could not identify this person or give a description of the individual other than to say it was a police officer. During pre-grand jury interview he states that he did not see anyone but felt compelled during the IAD interview to say he saw something. He felt this way because he knows victim and likes victim he felt bad that he could not say what happened and therefore convinced himself that he actually saw someone or something. But since that interview he has convinced himself that he did not actually see anyone behind victim or anyone hit victim. WALKER also suggested that perhaps if he was hypnotised [sic] he might truly recall what was going on versus what he indicates was tunnel vision.

During the pre-FGJ interview, WALKER indicated he would be willing to take a polygraph to clear up this discrepancy.

Walker's grand jury testimony contained all the information Conley needed to thoroughly impeach Walker's credibility as a witness: (1) he admitted to having given false information to the IAD about seeing someone behind Cox at the fence, while "now" he was saying he had not seen anyone; (2) he explained that he did this because he was feeling "guilty at not seeing more than what he saw and should have;" and (3) by stating that he "should have seen things happening directly in front" of him, but did not, he was at a minimum indicating his poor qualities as a witness.

The FBI Memorandum adds little to this information. As in (1), above, Walker admitted to having told IAD that he saw someone behind Brown, but since then convinced himself "that he did not see anyone running behind [Cox]. He only saw . . . Cox behind [Brown]." Similarly, as in (2), above, Walker explained this discrepancy because he "felt compelled during the IAD to say he saw something . . . because he knows [Cox] and likes [him] . . . [and thus] felt bad that he could not say what happened."

Thus, the essential ammunition needed by Conley to attack Walker's credibility as a prosecution witness was practically identical in both his grand jury testimony and the FBI Memorandum summarizing his statement to that agency.

We are thus left with two pieces of information contained in the FBI Memorandum that were not previously known: (1) Walker's

cryptic hypnotism statement; and (2) his willingness to submit to a polygraph test. These evidence are at best <u>de minimis</u> when compared with the powerful evidence in Conley's hands which showed that Walker had changed his testimony, not on a collateral, insubstantial issue, but on a critical question that went to the heart of the Government's case against Conley: his presence or absence from the scene of the assault against Cox.

The fact of the matter is that Conley's defense chose not to impeach Walker with his prior inconsistent statements, and for good reason. Conley needed Walker's trial testimony to the effect that he had seen a police officer at the bottom of the hill who fit Conley's description, thus placing Conley elsewhere than at the scene of Cox's beating. This was not just a question of passively failing to cross-examine Walker regarding his changes of heart. Conley's defense actually objected to the Government's attempt to introduce Walker's prior inconsistent statement, <u>see</u> Trial Tr. II at 51-52, and vigorously relied on his credibility in an attempt to establish by circumstantial evidence during his cross-examination (through evidence of the dropped and recovered radio), as well as during closing arguments, that Conley was the officer Walker saw at the bottom of the hill.

An argument first appearing in the district court's opinion, <u>Conley VI</u>, 332 F. Supp. 2d at 316, adopted by the majority, <u>maj. op.</u> at 17, articulates a new <u>Brady</u> rule regarding

distinctions between the kind of impeachment evidence provided by the FBI Memorandum (Walker's recall ability) versus that in his grand jury testimony (Walker's bias towards Cox). It is an argument never made by Conley's attorneys throughout the catalogue of initial actions and appeals in this case, from the trial through the initial habeas corpus proceedings, and which no amount of judicial voyeurism should be able resurrect. See, e.g., Playboy Enters. v. Public Serv. Comm'n, 906 F.2d 25, 40 (1st Cir.), cert. denied, 498 U.S. 959 (1990) ("An appellant waives any issue which it does not adequately raise in its initial brief"); United States v. Benavente Gómez, 921 F.2d 378, 386 (1st Cir. 1990) (arguments not raised in opening appellate brief are waived); KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 25 (1st Cir. 2003) (same).

Furthermore, the "ability to recall" versus "bias" distinction is one that fails to have any relevance to the facts of this appeal. Before the grand jury, Walker stated that "[he] should have seen" what was happening directly in front of him. What is that if not excellent material with which to attack a witness's ability to recall or perceive what took place at the fence that fateful night? I simply cannot agree with the majority that the grand jury "transcripts did not . . . provide Petitioner with any basis to impeach Walker's ability to recall." Maj. op. at 19. The grand jury testimony, like the FBI memorandum, mentions

that contrary to Walker's prior statements, he now believes that he did not see anyone running behind Brown, which pertains to Walker's ability to recall.[11] Yet, as explained, Conley's defense simply had no desire to take this counterproductive attack against Walker: Conley needed Walker's testimony about seeing a person resembling Conley at the bottom of the hill to show that Conley did not see the officers beat Cox, thereby rebutting allegations that he committed perjury in testifying that he had not seen the beating (Count 2).

It defies all logic to now claim that it was in Conley's interest to impeach Walker with the information in the FBI Memorandum, most of which he already possessed. Conley knew the following: (1) Walker and Cox were friends; (2) Walker felt guilty

_____

[11]The cases cited by the majority for the proposition that "suppressed impeachment evidence 'can be immaterial because of its cumulative nature only if the witness was already [or could have been] impeached at trial by the same kind of evidence,'" maj. op. at 19 (citing United States v. Cuffie, 80 F.3d 514 (D.C. Cir. 1996); United States v. O'Conner, 64 F.3d 355, 359 (8th Cir. 1995)), are inapposite. In Cuffie, the Court, immediately prior to citing this proposition, stated that "we must look not to the ways defense counsel was able to impeach [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." 80 F.3d at 518 (citations omitted). The Court reasoned that although the witness was impeached on other grounds, "[n]one of the impeachment that defense counsel conducted . . . related to perjury[,] . . . an infirmity in [the witness'] testimony that is almost unique in its detrimental effect on a witness' credibility." Id. Here, Conley's defense self-servingly chose not to impeach Walker's credibility with his ability to recall, although Conley could have certainly done so: both the grand jury testimony and FBI memorandum, for example, raise doubts on Walker's ability to recall because contrary to his prior statements, he now believes that he did not see anyone running behind Brown.

about not seeing more; (3) this guilt led to Walker making prior inconsistent statements; and (4) Walker believed that an "Officer Ryan," rather than Conley, was the officer who arrested Brown (another important memory lapse, but one which Conley did not wish to challenge).

I cannot conceive how any court can conclude that the failure to produce the FBI Memorandum undermines confidence in the outcome of Conley's trial. The facts in this case pale when compared with, for example, those in Moreno-Morales, 334 F.3d at 140. In that case, in which Brady relief was denied, we held that confidence in the outcome of the trial was not undermined notwithstanding the prosecutor's failure to reveal thirteen polygraph examinations by a key government witness who recanted in his testimony. Id. at 145-48. We reasoned that because the inconsistencies had been known by the defense through grand jury transcripts which it possessed yet chose not to use -- a situation almost identical to the present one -- the uncovered evidence "would have been merely cumulative, and 'the unavailability of cumulative evidence does not deprive the defendant of due process'" under Brady. Id. at 147-48 (citing United States v. Sánchez, 917 F.2d 607, 618 (1st Cir. 1990); Zeigler v. Callahan, 659 F.2d 254, 266 (1st Cir. 1981)). Similarly, in United States v. Sepúlveda, 15 F.3d 1216 (1st Cir. 1993), we found that although the withheld evidence of a "government deal" would have discredited a government

witness and was therefore "potentially useful to the defense," id. at 1220, we nonetheless held that it was "not enough" to undermine confidence in the outcome since "all the material for making that assessment was available to the jury, and the new information . . . added very little," id. at 1221. See also United States v. García-Torres, 341 F.3d 61 (finding that although a withheld evidence would have undermined a witness's credibility, it had "weak evidentiary value" and "substantial other evidence" supported the verdict and thus failed to undermine confidence in the verdict). Given our circuit precedent, I simply fail to see how the withheld evidence in this case, given its cumulative nature and weak evidentiary value, should at all undermine our confidence in the verdict.

## II

Equally important for Brady purposes, Walker's testimony is fully corroborated by valid, interlocking evidence, which makes the alleged Brady violation harmless. See Strickler, 527 U.S. at 293-94; García-Torres, 341 F.3d at 77.

As has been previously outlined, both Cox and Brown provided ample corroborating evidence at trial concerning the timing of Cox's pursuit of Brown at the fence, directly contradicting Conley's grand jury testimony. The testimonies of Cox and Brown not only complement of each other, but they are in critical agreement with Walker's core testimony describing Cox's

chase of Brown to the fence. Cox testified that he was right behind Brown as he pursued Brown to the fence, Trial Tr. I at 77-78, that there was no one between him and Brown when Brown reached the fence and climbed it, id. at 85, 88, and that he tried unsuccessfully to pull Brown down from the fence, id. at 129-130; Trial Tr. II at 14. Substantially equally, Brown testified that a black man wearing black clothing (a description matching Cox that night) ran after him as he was running toward the fence, id. at 94, and that he felt someone touch his foot as he was scaling the fence, id. at 95-96, 125. Walker's testimony duplicates Cox's and Brown's accounts: he saw Cox "three feet behind" a black male suspect, who climbed the fence while Cox reached for him. Id. at 30-31, 76. On this, Conley stated to the grand jury:

> Q: Did you see anyone else in plain clothes behind [Brown] as he went towards the fence?
> A: No, I did not.
> Q: Did you see, as he went on top of the fence or climbed the fence, another individual in plain clothes standing there, trying to grab him?
> A: No, I did not.
> Q: --as he went over the fence?
> A. No, I did not.
> Q: So that didn't happen; is that correct? Because you saw the individual [Brown] go over the fence?
> A: Yes, I seen [sic] go over the fence.
> Q: And if these other things that I've been describing, a second - another plainclothes officer chasing [Brown], and actually grabbing him as he went to the top of the fence, you would have seen that if it had happened; is that your testimony?
> A: I think I would have seen that.

-39-

Trial Tr. II at 235-36.

With all due respect to my various colleagues on both the district and appellate courts, who studiously and repeatedly have had to read through the evidence in this case, they need not have gone any further than the above to have reached the conclusion which is self evident: there was ample, credible, corroborating evidence with which to sustain Conley's flagrant perjury and obstruction of justice.

Although I have previously raised this concern, see Conley V, 323 F.3d at 25 n.14 (Torruella J., dissenting), I cannot close this dissent without commenting on the unjustified denigration of the Government's case by reason of its reliance on circumstantial evidence. Cf. United States v. Gamache, 156 F.3d 1, 8 (1st Cir. 1998) ("circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given); United States v. Hughes, 211 F.3d 676, 681 (1st Cir. 2000) (same). This unfortunate trend was initially commenced by the en banc court, id. at 16, was predictably continued by the district court, Conley VI, 332 F. Supp. 2d at 324, and has ultimately been crowned by the majority in this opinion, maj. op. at 15-16, whose blistering attack on Cox, Walker, and Brown would almost lead me to conclude that Cox assaulted himself were it not that I also have some knowledge of the evidence in this

-40-

case. Despite repeated attempts during cross-examination to challenge Cox's ability to recall the events of the night in question, Trial Tr. I at 102-03, 107-09, 117-25, 129, as well as Brown's credibility, Trial Tr. II at 130, 145-54, the jury convicted Conley of perjury and obstruction of justice. Of course, Conley wisely chose not to cross-examine Walker in the manner that he did Cox and Brown despite having all the ammunition that he needed to do so. Lastly, a point that has been consistently downplayed, if not outright overlooked, by my colleagues, Brown's testimony placing Conley at the fence while Cox was being beaten is anything but circumstantial evidence, a point conceded in Petitioner's brief, Brief for Petitioner at 6 n.4, although it is allegedly discounted because of Conley's acquittal on Count 2.[12] What is apparently neglected by this contention is that Conley's presence at the fence is also relevant to placing in context his perjured testimony to the effect that there was no one other than himself at the fence.

---

[12] I cannot agree with the majority's assertion that Conley's acquittal on Count 2 (i.e., for testifying that he did not observe anyone beating Cox), ostensibly means that the jury rejected Brown's testimony altogether and that Walker was the center of the government's case. Maj. op. at 13. It could very well mean that the jury did not credit that part of Brown's testimony in which he said he saw Conley watch the beating of Cox -- a part of Brown's testimony that was neither corroborated by Cox nor Walker. The rest of Brown's testimony, however, was corroborated by both Cox and Walker.

The circumstantial evidence argument is a red herring that obfuscates the fact that Brady analysis does not allow for a retrial of the case under the guise of a § 2255 proceeding, as the majority in effect does. See also Conley VI, 332 F. Supp. 2d at 324. This Court, in affirming Conley's conviction on direct appeal, deemed the circumstantial evidence sufficient. Conley I, 186 F.3d at 7. Nor did we find Walker's testimony to be the "linchpin" that Conley, and the majority, now makes it out to be. Maj. op. at 16. Because Cox and Brown were describing what actually happened to them at the fence, as opposed to Walker's eyewitness account of the events, the testimonies of Cox and Brown were just as crucial as Walker's. More importantly, the time for challenging the sufficiency of the evidence is long past. Kyles, 514 U.S. at 434 (determining materiality under Brady is "not a sufficiency of evidence test").

As Judge Bownes stated in his cogent dissent, in language familiar to those who have charged juries on a regular basis, "[C]ircumstantial evidence is just as reliable as testimony and at times, more reliable because it does not depend on the memory or judgment of what a witness saw and remembered and it is not subject to the biases and prejudices that are part of all human beings." Conley V, 323 F.3d at 18 (Bownes, J., dissenting). I suspect that this new "Conley rule" of circumstantial evidence will be a bounteous field for the myriad of defendants who up to now have

-42-

been charged and successfully convicted as a matter of course on such evidence.

For the reasons stated, I respectfully dissent.